IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JAMES  BRUNSON; and | ) | |
| BRUNSON PACKAGE, INC., | ) | |
| an Illinois corporation; | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | No.  12-225 MJR/DGW |
| v. | ) | |
| | ) | |
| MAX SCHAUF,       *et. al.* | ) | |
| | ) | |
| Defendants | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**COUNT I – FALSE ARREST – 42 U.S.C. § 1983**

Plaintiff responds herein to Motions by both the Bridgeport Defendants and Lisa Wade.

The Bridgeport Defendants argue that Count I should be dismissed, *as a matter of law,* simply because Brunson admitted to Bridgeport Police Chief Murray that he hit and kicked Harshman.  They believe this one undisputed fact, by itself, gave Murray and/or State's Attorney Wade probable cause to arrest Brunson for battery.  Plaintiff disagrees, also as a matter of law.

By way of background, this alleged battery occurred a little after 3:00 A.M. on August 7, 2010. Ex 1 ¶(71-89).  Brunson's store was closed for the night, but he decided to stay over in the store, due to prior acts of vandalism each of the previous two weekends, which Murray chose not to investigate. Ex 1 ¶(50-70). When Harshman vandalized his store that morning, an altercation ensued. Ex 1 ¶(71-89). Two weeks later, Brunson was charged with aggravated battery. Ex1 ¶(93-6).

In their Brief, the Bridgeport Defendants present no fact other than that Brunson admitted he hit and kicked Harshman, and they make no argument other than that this establishes probable cause, *per se.*  The Defendants then put forward an incomplete and misleading definition of battery – 720 ILCS 5/12-3 – to say a person commits battery "when he knowingly causes harm to an individual or makes physical contact of an insulting or provoking nature."  Def. Brief, p. x.

Defendants rely on further legal standards that Plaintiff does not dispute.  First, probable

cause is an "absolute bar" to a Section 1983 claim for false arrest. *Fernandez v. Perez*, 937 F.2d 368 (7th Cir. 1991). Second, the existence of probable cause is determined by a standard of objective reasonableness. *Graham v. Conner*, 490 US 386 (1989). Third, the existence or non-existence of probable cause must be determined by the *totality of circumstances* known at the time of the arrest. *United States v. Mounts*, 248 F.3d 712 (7th Cir. 2001). The Plaintiff would add that probable cause must be based upon *facts* that can be articulated, and which would lead an objectively reasonable person/investigator to believe that the criminal charge is likely justified. *Beck v. Ohio*, 379 U.S. 89, 93-6 (1964) (without a warrant); *Aguilar v. Texas*, 378 U.S. 108 (with a warrant)

Having offered no other articulable facts, the Defendants' logic is simply that: Brunson admits he hit (and kicked) Harshman, and that he did so intentionally to cause him harm. Therefore, by the definition of battery they have put forward, not only did they have probable cause to arrest Brunson, but he has already admitted his guilt. Of course, if Defendants truly believed that, they would not have waited more than three and a half years to bring Brunson to trial. Ex1 ¶(96).

What the Defendants have left out of their "definition" is the one element that is central to this case – self-defense. For example, no reasonable investigating officer would charge a homeowner with battery for hitting an armed home invader, not even if he first knocked him down, and then kicked him when he tried to get back up.

Police Chief Murray admitted as much during deposition, testifying that: he would not find probable cause to charge someone with battery if that person acted within the scope of self-defense Murray Deposition ("MD" p(16-7)). In other words, Murray does not true believe that the mere fact that X intentionally hit Y, even if undisputed, is sufficient to establish probable cause to arrest X, where circumstances show that X was acting in self-defense.

Murray is correct by law. 720 ILCS 5/12-3 actually defines the crime of battery as follows:

> (a) A person commits battery if he or she knowingly *without legal justification* by any means (1) causes bodily harm to an individual . . . .
> (Words in italics were omitted by the Defendants.).

Where the evidence at the time of the arrest shows that the use of force was *legally justified*,

the crime of battery has not occurred.   And if no crime has occurred, then *a priori*, probable cause does not exist.  That is a plain reading of the statute.

Both Murray and Wade should have known that, under Illinois law, legal justification is not merely an affirmative defense to be pleaded after arrest.  Rather, the *lack of legal justification* is a necessary element of the crime, which the State has to prove to show that battery has occurred.  To justify bringing this charge against Brunson, Murray and Wade needed to find, based on articulable facts, that there was at least probable cause to believe Brunson's use of force was not justified.

There are certainly cases where it is plain from the totality of circumstances that the existence of a legal justification is not at issue.  But this is not such a case.  Both Murray and Wade had ample notice (from Brunson's written statement to Murray which was duly reproduced in Murray's report to Wade) well before the arrest that Brunson claimed he acted in self-defense.  PR Ex 20 – Police Report ("PR") at 7-10; Ex 1 ¶79(y-aj) ok; and Wade Deposition ("WD") pp(12-3).

Specifically, Brunson reported to Murray before he left the scene of the crime that Harshman attacked him, not once but twice, in the early morning hours of August 7, 2010.  He then filed a written report the next day saying the same thing, which Murray placed in his police report.  PR p(7-10); Ex 1 ¶(79).  The gist of his description to Murray was that: After smashing his windows, Harshman attacked him once outside his store, threatened to kill him ("Now, you're fucking dead"), and then swung a hammer at his head, but Brunson was able to fend him off.  *Id.*  During this first altercation, Brunson struck one solid blow to Harshman's face, and  Harshman fell over backwards while disengaging, hitting the back of his head.  PR p(7-10); Ex 1 ¶(79) . Harshman fled down the back alley.  *Id.*  Brunson then followed him out to Akin Street, keeping about 50 feet behind him, and he called the police for help.  *Id.*  When Harshman realized that Brunson was following him (and calling the police), he (Harshman) suddenly turned and attacked him (Brunson) again.  *Id.*  Brunson then tried to back away (a fact that was observed and reported by an independent witness (PR p(14)), but Harshman overtook him.  PR p(7-10); Ex 1.  Believing he was in danger, which fear was reasonable under the circumstances, Brunson struck Harshman once in the face, knocking him

to the ground.  *Id.*  When Harshman started to get up, arching himself to spring,  Brunson kicked him once knocking him back down.  *Id.*  After that, they waited for the police to arrive.  *Id*.

720 ILCS 5/7-1 recognizes self-defense as a valid legal justification, and defines its scope:

> A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force .

It should have been clear to any objective investigator at the time of Brunson's arrest that there was (at least) a question of fact whether Brunson reasonably believed he was in imminent danger, and whether he reasonably believed the force he used – hitting Harshman once in the face with sufficient force to knock him to the ground, and then kicking him when he tried to get up and continue the fight – was necessary under the circumstances.

Yet, the Bridgeport Defendants have presented no evidence, and articulated no fact(s) in their Brief tending to prove that Brunson was not in imminent danger from Harshman, or that the force he used was more than was necessary to defend himself.  Nor have Defendants presented any explanation why an objective investigator or prosecutor might reasonably have believed at the time of the arrest that this was so.  Probable cause cannot be established without some evidence (beyond speculation) to negate Brunson's claim of self-defense.  But if the Bridgeport Defendants had some (arguable) factual basis for disbelieving Brunson's claim of self-defense, they have not said so.

Therefore, this Court should find that the Bridgeport Defendants have waived the right to present such an argument.  Plaintiff simply has no duty to answer arguments not presented.

It follows that the Bridgeport Defendants' Motion to Dismiss Count I should be denied as a matter of law.  Defendants knew that the facts (at a minimum) presented a genuine issue whether Brunson was acting in self-defense.  Yet they have not made the slightest factual showing that, under the circumstances, Brunson's use of force was not legally justified.

However, because Defendant Wade argues on the basis of the facts, and also in case this Court deems it necessary to reply-in-fact to the Bridgeport Defendants as well as in law, Plaintiff will make an affirmative showing of fact that he was acting in self-defense.  Plaintiff contends that

the weight of the evidence known at the time of the arrest showed overwhelmingly that he was telling the truth about acting in self-defense, and that Harshman was lying.

But perhaps the more trenchant point is that neither Murray nor Wade were objective investigators in the first place.  Murray appears to have targeted Brunson as part of a scheme with Mayor Schauf to intimidate Brunson and drive him out of town (Ex 6); or at a minimum, Murray felt he had to protect the Mayor's son Mark and his friend Jody Harshman because Schauf was his boss who could fire him at will (Ex 1 ¶ 11(wife and family to feed); Ex 3 ¶ (44-6)), so he targeted Brunson as the aggressor.  Wade either conspired with Murray to target Brunson; or at a minimum, she knowingly collaborated to cover up the involvement of Mark Schauf, and quite possibly the Mayor as well, in criminal act(s) targeting Brunson's store.  As a result, the investigation of this case was not only cursory and incompetent, it was consciously biased against Brunson, and designed to: cover-up a broader conspiracy involving Mark, Jody Harshman, and probably Schauf himself.

Both Murray and Wade knew from the start that it was likely the Mayor's son, Mark Schauf ("Mark"), was involved in Harshman's attack on Brunson and his store. Ex 2 ¶(31-43, 46-51). Mark was sitting in his car, waiting for Harshman on Akin street, just west of Main Street, when (and presumably before) Murray arrived at the scene.  Ex 1 ¶(82-5).  Murray arrived at 3:42. (Police Report – Ex 20 p(2) (showing Murray's ID is "102"); Ex 20 p(12) (log showing times for "102")).  Murray got the call from Dispatch about 3:30, dressed quickly, and hurried to the scene. Ex 20 p(2).  Naturally, with reports of gun fire and a person injured, Murray would have considered this an urgent call.  Ex 2 ¶(2, 30).  Yet, Mark somehow got there even before Murray.

There is no denying Mark was there.  Brunson even asked Murray when he arrived what Mark was doing there.  Ex 1 ¶(85);  According to Brunson, Murray seemed to think about it, but made no answer.  *Id*.  Murray admitted that he not only saw Mark at the scene but asked him why he was there. He said somebody called him and said Harshman was shot. MD p(31) Murray did not ask the next questions: Who called?  How could they have known Harshman was shot?  MD p(32).

At deposition, Plaintiff's attorney did ask.  Mark said Kay Stevens called to tell him she had

heard over police radio that Harshman had been shot. Mark Schauf Deposition (MSD) p(9-10).  He said she heard it over the scanner.  If Murray had asked Mark this himself, he would have known Mark was lying because they were not using police radio that morning. Ex 2 ¶(32-6); Ex 23 ¶(34-5).

Officer Dooley was a Bridgeport police officer, and the only one working under Murray at the time. Ex 2 ¶(2-3).  During the investigation, Murray told Dooley explicitly that he was puzzled how Mark could have known to come there because he and the other officers (as well as dispatch) were communicating via cell phones, not radio. Ex 2 ¶(32-9).  So Murray knew Mark could not have learned about the incident from monitoring police radio.  *Id.* The reason Murray told Dooley this was to inform him that he (Murray) thought Mark might have been involved in the crime. *Id.* This was a sound inference.  Either Mark knew in advance that Harshman intended to go over to Brunson's store at around 3:00 A.M., or else Harshman would have had to call Mark from the scene to tell him where he was.  But Harshman has admitted that he did not have a cell phone.  Harshman Dep. ("HD") at 33; whence he could not (possibly) have called Mark (to ask to be picked up).

It was well-known to Bridgeport police that Mark and Harshman were roommates, living 5 blocks away on Monroe St, and that Harshman does not drive.  Ex 2 ¶(40-3).  But it would seem doubtful that Harshman grabbed a hammer at 3 A.M. and decided randomly to walk five blocks to smash Brunson's windows.  Given that Brunson reported that the incident started when a car drove by his store on Judy Ave shortly after 3 A.M. (at a time when the street was empty), and then came slowly back to let someone off just a minute before his windows were smashed (Ex 1 ¶(73-7)), it is clear that *someone* drove Harshman to Brunson's store to smash his windows.  Ex 2 ¶(39, 42-3).

Mark would have been the obvious suspect, and Murray knew that.  *Id.*  Mark could have dropped Harshman off in front of Brunson's store, then circled around the block and waited to pick Harshman up (out of sight of Brunson's store) at the next street corner.  But, even if he was not Harshman's driver, it was clear that Mark knew in advance that Harshman was headed over to Brunson's store at 3 A.M.  And Harshman would have had no honest reason for this. Ex 2 ¶(37).

In fact, Harshman had been heard at JD's bar publicly bragging about how he could mess up

Brunson's store and nothing would happen to him because Mayor Schauf would protect him. Ex 7; Ex 8. After announcing this freely at a bar, it is hard to believe that he did not also discuss it with his roommate. Thus, it appears Mark was an accomplice to a premeditated crime against Brunson. But rather than investigate, Murray appears to have decided to cover it up. Ex 2 ¶(38-44, 51).

Lawrenceville Officer Lyle was a first responder at the scene. Ex 1 ¶(80-90). He took charge of the initial stage of the investigation. *Id.* When Murray arrived, Lyle asked Murray in front of Brunson if he (Murray) wanted to take over the investigation. *Id.* Murray said he did. Then Brunson asked if he (Murray) was sure that was a good idea. *Id.* Murray seemed to waver. He told Brunson and Lyle he would call the State Police to investigate. *Id.* But they were never called in. Ex 1 ¶(90).

Officer Dooley avers that Wade confided to him (Dooley) in a private conversation, during the investigation and before the arrest, that Murray had told her: (a) Mark was present at the scene; and (b) his presence was puzzling because they were not using police radio. Ex 2 ¶(46-8). This means Wade must have already talked this matter over with Murray, during the investigative phase of the case, and they must have discussed the likelihood that Mark was Harshman's accomplice.

Wade further told Dooley that she believed this created a conflict of interest for Murray because Mayor Schauf was his boss. Ex 2 ¶(49). Clearly, that would have made it: (a) difficult for Murray to investigate Mark; and (b) even more difficult to make an objective determination whether the evidence uncovered was sufficient to establish probable cause to charge Mark with a felony.

At deposition, Murray denied he would have had any difficulty investigating the Mayor's son on a felony charge. MD p(131-2). But, on a prior occasion, for a lesser matter, Murray admitted he was afraid to cross the Mayor for fear of losing his job. Ex 1 ¶(11).

At deposition, Murray claimed that he did call the State Police and they said they do not investigate cases unless they are called immediately to the crime scene. MD p(19); but see Ex 4 where Murray tells a local reporter "This is all still under investigation with the State Police."). Whatever the general policy is, it is unlikely that it applies to conflicts of interest that may arise. However, Murray said he did not inform the State Police about the conflict of interest. MD(130-2)

Officer Dooley believes that any objective investigator would have recognized the conflict of interest here, and acted upon it.  Ex 2 ¶ (43-5).  He says calling in the State Police would have been proper procedure.  *Id.*  Wade apparently agreed as well.  She told Dooley (during the conversation described above) that she believed she should call in the State police.  Ex. 2 ¶(49).  But when Dooley asked her why she did not do so, she said it was because Murray refused to put the evidence implicating Mark Schauf into his police report.  Ex. 2 ¶(50-1).

In other words, Wade told Dooley that Murray knowingly refused to put material evidence into his police report.  That implicates Murray in a cover-up of Mark's felony.  But it also implicates Wade, because her answer was obviously a pretext.  She is a State's Attorney.  She did not need Murray's permission to report to the State Police that the Mayor's son Mark was a likely accomplice to a felony, and that the local Police Chief had a conflict of interest.  An objective prosecutor in her position would have concluded that Murray's refusal to put material evidence implicating Mark into his police report already showed he was not an impartial investigator.  Therefore, her claim that she could not call the State Police *because* he was refusing to put this evidence into his police report makes no sense.  His refusal should have confirmed to her that the State Police must be called.

It is also troubling that, at deposition, Wade denied that she had considered any of these matters.  Wade Deposition ("WD") p(43-4) (saying she does not even know who Mark Schauf is, much less that he was there at the scene of the crime).  But, in light of Dooley's testimony, it appears she was lying to cover up either for Murray or for her own misconduct.  And in any case, there is no doubt Mark Schauf was there, so there is something wrong if Murray never told Wade.

Since Wade's reason for not calling in the State Police was a pretext, a fact-finder could reasonably infer that her real motive for not calling the State Police was that she was colluding (or cooperating) with Murray in a cover-up of Mark's likely complicity in the crime against Brunson.

As part of that cover-up, in order to deflect attention from Harshman and to discredit and defame Brunson, Murray and Wade apparently agreed to make Brunson the primary target of their indictments, charging him with felony battery, while only charging Harshman with the lesser crime

of criminal damage to property, even though Harshman clearly committed aggravated battery when he swung a hammer at Brunson's head.  Ex 1 ¶(92-6).  This enabled Harshman to get off with a misdemeanor and probation, *Id.,* despite having a criminal record that included two prior felonies. Ex 20 p(12);  To this day, more than three-and-a-half years later, Brunson (who has a clean record) remains charged with a felony.  Ex 1 ¶(92-6).  The prosecution refuses to bring the case forward. *Id.*

But the problem runs much deeper than covering up for Mark.  The decision not to call in the State Police altered the course of the entire investigation, tainting the whole case with corruption.  If the State Police had been called in, they would have investigated Max Schauf and his gang of crooks, instead of giving them a free pass as the local law enforcement did.[1]  By not investigating, they reinforced the notion that Mayor Schauf, his family, and his cronies were above the law.

If one examines the police report compiled by Murray, it is obvious that he did not really investigate this case.  See Ex 20.  All he did was compile witness statements – from Harshman, Brunson, Tena Seed, the dispatcher, and the first responders to the scene.  He did write and sign a brief narrative.  Ex 20 p(2-4).  But that narrative did no more than summarize each of the witness statements described above.  There was no analysis, no comments about internal inconsistencies, or contradictions between witnesses, not a single follow-up question for any witness, and no opinion expressed by Murray as to weight of the evidence.  As already noted, Murray did not even ask Mark why he was there.  Nor did he ask Harshman to explain his motive. These questions should have been obvious to any objective investigator.  Murray obviously did not want to know the answers, perhaps because he believed they would lead back to Mark Schauf and the Mayor.

But again, this calls into question Wade's integrity as well.  She read Murray's report.  WD p(11-12).  She saw that he studiously avoided investigating this incident.  It is also implicit in her statement to Officer Dooley that she knew Murray was suppressing evidence implicating Mark.

This deliberate cover-up of Mark's likely involvement should have been enough to warn

---

[1]     Plaintiff notes that it was the State of Illinois, through Liquor Commission agent Randy Mendenhall (who found multiple violations of State Liquor laws by Schauf and his girlfriend Beverley Pruez); and federal government (through the FBI) who finally brought Mayor Schauf down.  Local authorities would never touch him.  Plaintiff also believes Mr. Mendenhall's investigations helped trigger or at least fuel the FBI investigations.

Wade that Murray's investigation was biased and unreliable. But the cover-up did not end with the Mayor's son.  Evidence suggests that it extended to Mayor Schauf and Jody Harshman as well.

As background, Murray was well aware that Schauf had given him a series of unsupportable orders to enforce so-called liquor violations at Brunson's store.  Ex 1 ¶(13); Ex 3 ¶(43-6) For example, Brunson was told he cannot hire an underage sales clerk to work at his store.  Ex 1 ¶(13). There is no such law or ordinance. Ex 3 ¶(43).  He was told he cannot operate a liquor store in Bridgeport if he lives out of town. Ex 1 ¶(13).  There is no such law or ordinance. Ex 3 ¶(43). He was told he cannot hang signs outside his store advertising the current sale items.  Ex 1 ¶(13). There is no such law or ordinance.  Ex 3 ¶(43-6). Schauf also ordered the police to conduct surveillance at Brunson's store to try to find something to charge him with.Ex 1 ¶(45-6);  Ex 2 ¶(10-15).  In addition, Schauf instructed Brunson's wholesale supplier, Scott Gray, not to sell liquor to Brunson's store anymore. Ex 5; Ex 1 ¶(39-44); Ex 3 ¶(28-37). There was no legal basis for this instruction.  *Id.*

Murray also knew that Schauf had refused to renew Brunson's liquor license in May 2010, even though there was no cause for denying the renewal.  Ex 1 ¶(18-41).  Murray knew this was wrong.  He even told Brunson in April just before the old license expired: "I don't know what he's going to do.  But if I were you, I would get a lawyer."  Ex 1 ¶(21-2).  Schauf's animosity for Brunson was no secret in Bridgeport.  Ex 1 ¶(17, 22).  It was clear Schauf's plan was to shut down his store indefinitely, under the guise of "reviewing" his license renewal application.  Ex 1 ¶(23-30).

ILCC investigator Mendenhall was sent down to Bridgeport to find out why this license was not renewed. Ex 1 ¶(32-3).  Such license renewals are generally *pro forma*.  Ex 1 ¶(32-3);  Ex 3 ¶(21-9).  Mendenhall asked Schauf why he had not renewed Brunson's license and found Schauf had no reason.  Ex 3 ¶(26-8).  He told Schauf that there was no such thing as a review period after a liquor license expires.  *Id.*  And, there was nothing to review in Brunson's case because he had had no violations.  *Id.*  Mendenhall concluded that Schauf and Murray had been using their offices as Police Chief and Liquor Commissioner to repeatedly harass Brunson.  He told Murray that the next time he has a notion to harass Brunson with some rule that Schauf made up, "you better come to me

first to find out if it is law or not"  Ex 3 ¶(45-6).  Mendenhall also called Scott Gray and told him

that Schauf had no authority to order him not to sell liquor to Brunson. Ex 3 ¶ (31-7).

In addition, Murray was fully aware that the act of vandalism at Brunson's store on August 7,

2010 was not an isolated event.  Brunson's store had been vandalized on the two previous weekends

(in July 2010) as well.  Ex 1 at 49-54, 59-70.  On each of the prior occasions, Brunson told

Bridgeport police that he believed Harshman was the perpetrator, and he believed Harshman was

acting at the behest of Schauf.  Ex 2 ¶ (20-3); Ex 1 ¶ (59-70).  On the first occasion, Brunson even

showed Murray physical evidence that the perpetrator left behind – a flashlight and safety glasses

(used to try to drill through the hinges on the reinforced back door).  *Id.*  But Murray did not

investigate these matters.  *Id.*  He did not, for example, try to take fingerprints to see if Harshman (a

twice convicted felon (Ex 20 p(12)) whose fingerprints would have been on record) was the

perpetrator.  MD p(96).  Murray then shrugged the matter off, telling Brunson it was just the work

of "teenage vandals."  *Id.*  In light of the fact that Murray himself wanted to run Brunson out of

town (see Ex 6), this may have been a pretext for allowing Brunson's store to be targeted.

Before the incident of August 7, Harshman had been boasting that he had a free pass from

Mayor Schauf to bust up Mr. Brunson's store.  Ex 7; Ex 8.  It appears that Murray was acting in

concert with Schauf to protect Harshman.

In any event, it does not seem likely that teenaged vandals would come packing a drill,

flashlight, and safety glasses to try to remove the reinforced back door of Brunson's store.  Yet,

Murray made no serious attempt to investigate, and took no proactive measures to protect Brunson's

store from further attacks. Ex 1 ¶ (64-7, 72).  At deposition, Murray testified that he did order

Dooley, who was the night officer for Bridgeport, to conduct "extra patrols" at Brunson's store. MD

p(94). But Dooley avers that he was not asked to conduct any such extra patrols. Ex 2 ¶ (26).

The Bridgeport police, Lawrenceville police, and Lawrence County Sheriff's Department

work closely together.  As Murray put it, they are "one family".  MD p(13).  With that in mind,

Brunson also believed that several incidents involving the Sheriff's Department and the State's

Attorney's office also suggested he was being targeted by local authorities.  Ex 1 ¶ (98).

The incident that most directly involved Wade was the theft of some of his tools valued at about $2,500, plus damage to his property from the break-in  Ex 1 ¶ (98(a)).  Brunson reported this to Officer Ash.  *Id.*  The police did not do anything for him.  *Id.*  Brunson himself found the likely perpetrator, and gave Ash the name and address of the perpetrator and a witness. *Id.* Ash said he filed a report, but he could not do anything until he got a warrant from Wade. *Id.* Brunson called Wade's office repeatedly and left messages. *Id.* She would never answer. *Id.* But a representative from her office said they could not do anything without a full police report.

In her Brief, Wade states that Brunson admitted he never spoke to her directly.  But that was because she would not speak to him or return phone calls. Ex 1 at xx.  Local enforcement officials were giving Brunson a run-around. *Id.* They had convincing evidence that Donnie Rudolph was the thief, and Brunson even found Rudolph's address for them.  *Id.*  But he was never arrested.  *Id.*  That left Brunson with the impression that Wade would not do anything to protect his property.

Although these incidents were not directly related to the acts of August 7, 2010, they contributed to Brunson's belief that he and his store were under siege.[2]  That is why he decided to camp out in his store with a gun on Friday night, August 6, 2010.  Ex 1 ¶(72).

Brunson did succeed in catching Harshman vandalizing his store that night/morning.  Ex 1 ¶(79 (a)-(b))  He also spotted the Mayor's son waiting for Harshman in a car at the next corner. Ex 1 ¶(82-3).  Because Harshman was caught red-handed, there was no doubt he was the vandal.

But Murray did not even ask Harshman the most basic question that any competent investigator would have asked: "Why did you do it?"  Or if Murray did ask, he did not put the answer in his police report.  Ex 20 (no mention of Harshman's motive).  According to Harshman's written statement in that police report, his action was random.  At 3 A.M. on August 7, he just grabbed a hammer, and walked about 5 blocks, to smash Mr. Brunson's windows.

---

2   Brunson also had two rental houses he owned burn down on successive days in December 2009.  This was an unlikely coincidence.  Nor was it something Brunson would benefit from, since he had no insurance on one property and minimal insurance on the other.  Ex 1 at xx.

Harshman was a 35-year-old at the time.  Ex 20 p(5).  He was no teenage vandal.  Perhaps the reason Murray did not ask him his motive is because he already knew. Bridgeport is a small town.  Schauf's hostility to Brunson was well-known.  Indeed, Murray seemed to share it.  Ex 6.  Perhaps Murray also knew already what Harshman had been bragging about at JD's bar – that he was acting for Mayor Schauf and under his protection.

Whatever the reason, Murray decided not to pursue whether Harshman was paid by Schauf to bust Brunson's windows and/or whether Harshman was involved in the prior acts of vandalism at Brunson's store.  This decision was not reasonable.  Brunson had already identified Harshman as the person he suspected, even before he actually caught Harshman red-handed on the third try.  Ex 2 ¶(23).  And Brunson had already told Murray he thought Schauf was behind the prior acts of vandalism, even before Murray saw Mark at the scene of the crime. Ex 1 ¶(63-6);

Harshman had been a long-time employee (on and off) at AMS Tools, a shop owned and operated by Schauf from 1998 to 2004.  SD p(46-7).  But Schauf averred that he had not hired him since then.  *Id.*  In addition, he was known to be a friend of the Mayor's family, who was living with Mark that summer.  HD p(6); Ex 2 ¶(22).

At deposition, Plaintiff's attorney did get a chance to ask Harshman why did he did it.  Under oath, Harshman said there was a woman he loved (though unrequited).  HD p(23).  According to Harshman, she had spoken to him over the phone on the evening of August 6 and told him that Brunson had insulted her (in a sexually suggestive manner) at his store.  *Id.*  Harshman said this made him very angry.  *Id* at **.  He started drinking, and getting angrier as he drank.  *Id.*  Finally, he decided to settle the score by smashing Brunson's windows.  *Id.*

The unpremeditated nature of this motive clearly does not mesh with Harshman's boasts at JD's bar.  Exs 7 and 8.  Moreover, Plaintiff's attorney of course asked for the woman's name – Katherine Pritts. HD at xx. He then tracked her down and she categorically denied Harshman's story.  Ex 12.  She said she had only been in Brunson's store once.  *Id.*  And he had never insulted her or made sexual innuendos.  *Id.*  Nor had she ever complained about Brunson to Harshman.  *Id.*

If Murray had not been covering up for Harshman and the Schaufs, he would have asked these same questions.  If Harshman had told him at the time about Pritts, Murray would have discovered he was lying. If Harshman had given no explanation at all, Murray would have known he was hiding something.  Again, Bridgeport is a town of only about 2500 people. It would not have taken much effort for Murray to discover what Harshman was saying about having a free pass to vandalize Brunson's store.  Since the Mayor's son was inexplicably present at the scene of the crime, it should not have been hard from there to infer that the Mayor might be a suspect as well.

At Deposition, Harshman denied that Schauf ever paid him to do something illegal. HD p(18). However, Brunson and another witness Kyle Gosnell both aver that they had a conversation with Cody Cessna in the summer of 2013, in which Cessna said that he, Harshman, and Schauf sat down together one evening at AMS Tools and discussed vandalizing Brunson's store.  Ex 1 ¶(97); Ex 13.  According to Cessna, Schauf put a wad of money on the table and offered it to Harshman if he would "bust up Brunson's store."  *Id.*  Cessna said that Harshman asked how much it was, and Cessna offered to count the money for him.  *Id.*  After that, Harshman took the money.  *Id.*

Again, as background, Schauf had (and still has) a strong interest in the liquor business in and around Bridgeport.  In particular, he owns Madd Maxx Pizza and Pub in Westport (Lawrence County); he co-owns and co-operates with his long time girlfriend, Beverly Pruez , a bar called Railroad Inn in Vincennes, just across the border in Indiana; he purchased the Veterans Club in Bridgeport for Pruez to own and operate (with Schauf as a silent partner); he built Pruez a building (about a year ago) in which to open her Russellville Bar and Pub (Lawrenceville address); and Mark Schauf just opened a bar and restaurant in Bridgeport called The Place To Be. Ex 3, ¶(5-6). Notably, Harshman was listed as a member of the corporate Board of the Veterans Club. Ex 3 ¶(8(b)). At deposition Schauf denied Pruez is his girlfriend. Schauf Deposition ("SD") p(10) ("an acquaintance").  But Pruez admitted that she is.  See Ex 3  ¶(7-8, 11-16).  See also Ex 2  ¶(59-61).

Shortly before Brunson purchased his package store, in 2009, Schauf approached Henry Kijonka to purchase the store and liquor license. But Brunson outbid him.  Ex 1 ¶(4-6).

Of course, as liquor commissioner for Bridgeport, Schauf could not actually own a bar or package liquor store in town.  But that did not stop him from using his girlfriend Pruez as a front for his own shadow ownership. Ex 3 at 7-8, 11-16; Ex 2 ¶(59-61).

As this Court already knows, Schauf is an unsavory character. Well after Brunson filed these civil allegations, Schauf was investigated and arrested by the FBI.  Ex 10.  He pled guilty to three counts of mail fraud and one count of obstruction of justice in this Court.  Ex 10. Schauf admitted that from July 2008 until March of 2011, he had engaged in a scheme to defraud the city of Bridgeport, as well as its residents by submitting false and fraudulent invoices, contracts, and bills for services and equipment.  *Id.*  He also admitted that he had obstructed justice by coaching a key witness to give false and misleading testimony to the FBI, regarding the investigation into his (Schauf's) fraudulent activities.  *Id*.  That witness also pled guilty.

In addition, the Illinois Liquor Control Commission ("ILCC") has found Schauf's and Pruez's liquor establishments to be in violation of a number of State liquor laws including: gambling, importing liquor across state lines to avoid Illinois sales tax, and subterfuge ownership (at the Veterans Club) in Bridgeport.  Ex 3 ¶(8-11).

Prior to his sentencing in this Court, Schauf had long been a small town crook and bully, using his offices as Mayor and Liquor Commissioner to make money for himself, and to bully and intimidate anyone in his way.  Yet, he was never investigated by local authorities or the Lawrence County State's Attorney.  It took the State Liquor Commission and the FBI to bring him to justice.

In light of Schauf's admission that he coached a witness to lie to the FBI, Brunson asks this Court to note that Harshman's story about Pritts surfaced for the first time on his facebook page on September 19, 2013, Ex 9, just one week before depositions were taken.  In their Brief, the Bridgeport Defendants have dutifully pointed to this story as "proof" that Schauf had nothing to do with Harshman's act of vandalism. [cite Brief]  In other words, the Pritts story was intended to be Schauf's "alibi." Only it is a lie.

Curiously enough, Schauf had just re-hired Harshman to work for him three weeks before

deposition. SD p(46-7). Before that he had worked "on and off" for Schauf from 1998-2004, but not since. *Id.* It is also noteworthy that what he told Murray at the time of the incident is just that he got "intoxicated" and just "felt like" smashing Brunson's windows. MD p(71). As upset as he was supposed to have been about Pritts, he forgot to mention it. Given Schauf's history of dishonesty and witness tampering, Plaintiff infers that Schauf bribed Harshman (with a job) and coached him to provide this explanation to serve as Schauf's alibi.

The Plaintiff contends that the facts discussed above are sufficient, when viewed in the light most favorable to the Plaintiff, to at least create a question of fact whether Murray and Wade were involved with Max Schauf, Mark Schauf, and/or Jody Harshman in a concerted effort to cover up the complicity of Max and Mark Schauf in the efforts to bust up Brunson's store and ultimately put him out of business. This same reasoning applies to Count V, the state law conspiracy claim below.

But even if this were not a deliberate cover-up, the facts known by Murray and Wade about the specific incident of August 7, 2010, or the facts they should have known, when viewed in the light most favorable to Brunson, suffice to (at least) raise a legitimate question for the fact-finder to decide whether Murray and Wade should be held liable under Count I for False Arrest.

There are, of course, two conflicting narratives of the supposed battery – Brunson's and Harshman's. Under Harshman's account, Brunson chased him down from behind (going east on Akin Street), hit him and then kicked him. Under Brunson's account, Brunson followed Harshman (going west on Akin Street), but he kept his distance and called the police for help. When Harshman noticed Brunson following him, he abruptly turned around (now going east on Akin) and charged at Brunson. Brunson backed away (also going east on Akin), but Harshman overtook him. Brunson thought he was in danger and so he hit and kicked Harshman in self-defense.

If both accounts were equally plausible, then this would be a question for the jury to decide. However, there was other independent evidence, known to Murray and Wade at the time of the arrest, which overwhelmingly corroborated Brunson's account and which proved that Harshman was lying about the central point of his account. Furthermore, Harshman was so drunk that night,

263 mg/dl according to the Hospital report, that he could not possibly have given a clear-headed rational account of events.  Ex 21 p(9-11).

According to Brunson, the entire incident divided into three parts. First, Harshman smashed his windows.  Ex 1, ¶(73-7).  Then the two of them engaged in two distinct physical altercations, hereinafter referred to as the first and second altercation.  The first altercation occurred just outside Brunson's store. Ex 1, ¶(79((a)-(l)). The second occurred on Akin street. Ex 1, ¶79((m)-(aj)). According to Harshman, there was only one altercation.  It was on Akin Street. Ex 20 p(5-6).

In a nutshell, Brunson accuses Harshman of first smashing his windows and then swinging a hammer at his head in the first altercation just outside his store (Ex 1, ¶(79((a)-(l))).  Harshman denies attacking Brunson.  But he accuses Brunson of vigilante action for following him out to Akin street, chasing him down from behind (going east on Akin Street), and then hitting him in the head and kicking him when he was down.  Ex 20 p(5-6).  Brunson denies that he chased Harshman down from behind on Akin Street.  He says Harshman chased him down (going east on Akin Street) and that he (Brunson) hit Harshman once and kicked him once, in self-defense.  Ex 1, ¶79((m)-(aj))

If Murray and Wade truly had taken the position that both of these accounts were equally plausible, then they would have charged both men with aggravated battery, and let the jury decide.

However, they only charged Brunson with aggravated battery.  Assuming they were not acting out of deliberate bias, the only rational explanation for that decision is that they must have decided that Harshman's account was likely true (he chased me down from behind); and Brunson's likely false (he swung a hammer at my head) . That flies in the face of the actual evidence below.

The layout of the scene is essential to evaluating credibility. Ex 1 ¶(78).  Brunson's store faces Judy Avenue which runs north-south.  *Id.*  There is a driveway in front (facing east to Judy Ave), which then swings around the north side of his store, going west to an alley behind the store, parallel to Judy.  *Id.*  The alley runs north to Akin street.  *Id.*  There are two houses immediately to the north of Brunson's store, and therefore just east of the alley.  *Id.*  The first house north is owned by Harshman's uncle.  *Id.*  The second house north, faces Akin street.  It is owned by Harshman's

grandmother. *Id.* This house does not actually sit at the corner of Judy Avenue. *Id.* There is a small building at the corner with Judy, just east of the grandmother's house, called Jack's Barber shop. *Id.*

If one goes north on the alley to Akin, one can either turn left (west) towards Main street, or right (east) towards Judy Avenue. *Id.* Mark Schauf was seen waiting for Harshman on Akin just west of the intersection with Main. Ex 1 ¶(82).

The sliding garage door (for a car) of grandmother's house faces Akin street. Ex 1 ¶(78). However, there is a back/side door on the southwest corner of the garage, facing directly toward the alley. *Id.* The shortest path for someone running to the back/side door of the garage from the alley would have been to cut east-northeast between the grandmother's and the uncle's house. *Id.*

The witness Tena Seed lives in a house that faces onto Main Street, but is located on the southeast corner of Main and Akin. *Id.* Her side windows face north towards Akin street, but look out on Akin street well to the *west* of the alley. *Id.* Murray obviously would have known this.

According to Brunson, after Harshman smashed his windows, he (Harshman) cut through the driveway, headed towards the back alley. Ex. 1 ¶(79(a)-(g)). Brunson stepped from the back of the store, recognized Harshman, and called him by name. *Id.* Harshman turned and charged Brunson, who took a few steps back, pulled out his gun, pointed it at Harshman's feet, and told him to stop. *Id.* Harshman did not stop, so Brunson fired his gun, but it audibly misfired. *Id.* From that point on, Brunson did not trust the gun would work and did not try to fire it. Ex. 1 ¶(79(n)).

Harshman then said: "Now you're fucking dead," and swung his hammer at Brunson's head. Ex. 1 ¶(79(h)-(o)). Brunson blocked the blow, and landed one solid punch in Harshman's face. *Id.* Then the two grappled hand-to-hand. *Id.* The gun went off. *Id.* No one was hit, but Harshman pulled away from Brunson. *Id.* In so doing, he fell backward and hit his head. *Id.* He got up, and headed north down the alley, ending the first altercation. *Id.*

Brunson decided to follow Harshman down the alley, reasoning that, otherwise, the police would never arrest Harshman. Ex. 1 ¶(79(p)-(r)). He kept his distance, at about 50 feet. *Id.*

When Harshman reached the alley, he turned left (west). Ex. 1 ¶(79(q)-(w)). He did not

appear alarmed. *Id.* He did not appear to even know Brunson was following him at the time. *Id.* Brunson took out his cell phone and called the police. *Id.* He told the Dispatcher that Harshman had just smashed his windows and was walking down Akin street. *Id.* He asked that officers be sent to arrest Harshman. *Id.* Meanwhile, Harshman was heading west on Akin street, near Main street. *Id.* He stopped and tossed the hammer a good way into the lot on the northeast corner of Akin and Main. *Id.* Later, this was exactly where Brunson took the police to find the hammer. *Id.*

At this point when he tossed the hammer, Harshman suddenly seemed to notice Brunson following him, and he turned around and charged at Brunson. Ex. 1 ¶(79(w)-(aj)). Harshman was now heading back east on Akin, but still on the section of Akin Street that is west of the alley. *Id.* Brunson began walking backwards, not wanting to take his eyes off Harshman. *Id.* He was still on his phone, asking police to hurry because Harshman was coming at him. *Id.* In this manner, he continued to back away east on Akin with Harshman gaining on him. *Id.* They went past the alley onto the section of Akin that is east of the alley. *Id.* Harshman overtook him near Jack's Barber Shop. *Id.* At that point, Brunson acted to defend himself, hitting Harshman once in the face and knocking him over. *Id.* Harshman tried to scramble back up, getting up to his hands and knees and arching his body as if to tackle Brunson. *Id.* Brunson felt that he was still in danger. *Id.* So he kicked Harshman. *Id.* At that point, Harshman appeared to give up. *Id.*

Brunson now took the clip out of his gun and fixed the jam. *Id.* Harshman sat up and smoked a cigarette. *Id.* Brunson held him at gunpoint until the police arrived. *Id.* During the second altercation, he hit Harshman only one time, and kicked him only one time. Ex. 79 ¶(aj).

According to Harshman, he never attacked or hit Brunson at all. Ex 20 p(5-6). This already calls his story into doubt because Brunson had scratch marks on his arm and a wound on his head, which he showed to police (who took pictures that do not copy well). Ex 20 p(1) (39 pictures taken) Ex 24 (poor picture of Brunson's arm); WD at 34-5 ** (minor wounds). Harshman says he turned away, when Brunson accosted him, and headed north up the alley towards Akin street. Ex 20 p(5-6). Brunson followed, firing shots at him in the alley. HD at **; Ex 20 p(5-6). Harshman said

he feared for his life and so decided to run to the shelter of grandmother's house.  HD at **; Ex 20 p(5-6).  He claimed to have a key with him, and said he planned to enter the garage and lock the door.  *Id.*  Inexplicably, however, rather than making a bee line to that door. he first ran all the way to Akin street, then turned right (east) on Akin going to the front of grandmother's house. Furthermore, instead of cutting back to the garage, he kept on going down Akin Street to Jack's Barber shop where the altercation took place.  Ex 20 p(12).

An objective investigating officer familiar with the neighborhood would not have found Mr. Harshman's story about planning to hide in grandmother's garage, or his geography in implementing that plan very plausible.  Furthermore, when Brunson first accosted him, he was literally five steps from his Uncle's front door.  Ex 1 ¶(78(a).  If he was scared, why not just bang on his uncle's door?

Harshman also said he was dodging gunfire as he ran north down the alley.  HD p(31-2). Yet, before he turned right (east) on Akin street, he first stopped and threw his hammer some 150 feet in the opposite direction, out onto the lot at the northwest corner of Main and Akin, where the police found it.  Ex 1 ¶(78(g); MD p(80).  That would have been quite a hammer throw for any man, much less one with a 263 mg/dl bac.  Ex 21 p(11).  Besides, if he was running for his life, why would he stop at all, and why would he throw away his only weapon?  His story did not make any sense.

However, even if Murray and Wade did not read closely, the most glaring evidence in Brunson's favor was the testimony of the independent witness, Tena Seed.  Ex 20 p(14).  Her address is on Main Street.  *Id.*  Any investigator knows that when two parties tell conflicting stories, the testimony of an independent witness who has no reason to favor either side should carry a lot of weight.  Ex 2 ¶(53-8).  Brunson did not know Seed at all.  Ex 1 ¶79(h).

Seed says she heard one (and only one) gunshot. Ex 20 p(14). She looked first out her south and east facing windows, but could not see anything. Id. Then she looked out her north window, facing onto Akin Street, and saw two men.  *Id.*  One man was walking backwards and talking on a cell phone. *Id.*  The other was coming towards the man on the cell phone.  *Id.*  Harshman did not have a cell phone that night. HD p(33)  So the man on the cell phone had to be Brunson.  The man

coming toward him had to be Harshman.  Seed further stated that these two men were moving from west to east on Akin Street, and that they were on the section of Akin that is west of the alley (because that was all she could see).  Ex 20 p(14).  Furthermore, she said that, while she watched, the man who was charging was closing ground on the man with the cell phone who was backing away.  *Id.*  Seed said that when they reached the alley, heading east, they passed out of her sight.  *Id.*  Her view of the section of Akin east of the alley is blocked by a tree.  *Id*.

Seed's account totally corroborates Brunson's, and totally contradicts Harshman's.  No objective investigator could possibly have read Seed's account and still believed Harshman's story that he turned east at the alley, and Brunson chased him down. If that were true, Seed would never have seen either of them. But Seed's account exactly matches Brunson's story that Harshman turned west first towards Main Street, then turned around when he saw Brunson following him and charged back east at Brunson (while Brunson backed away), just before the second altercation took place.

In sum, there are two major external indicators of credibility here which clearly support Brunson and discredit Harshman – (1) an independent witness corroborated Brunson; and (2) Harshman was so drunk (263 mg/dl) that no competent investigator would have trusted his account. This is even before one takes into account that Harshman is a two-time felon, and a self-confessed drunk, brawler, and hoodlum.  On facebook he described the old Jody Harshman (before he found religion) as someone who could beat the brains out of somebody.  And he was the one who made an unprovoked criminal attack on Brunson's store, for which he lied about his motive.  No reasonable investigator would find this to be a case of two equally plausible stories. Ex 2 ¶(53-58).

Wade stated at deposition that she did not have Harshman's Hospital Records at the time of the arrest, and to her knowledge still did not.  WD p(72-3) (They were not submitted during discovery in this case either). Brunson's criminal defense attorney, Brian Shinkle, attests that he was told repeatedly by the prosecution that the State was having trouble obtaining these records from the Hospital, and that Harshman would not sign a release. Ex 25. But Harshman clearly signed a release on August 7, 2010.  Ex 21 p(21). The State's failure to obtain these records delayed this case from

going to trial, and is inexplicable. Shinkel had no trouble getting these Records by subpoena. Ex 25.

This is yet one more disturbing indicator that they were covering up evidence favoring Brunson. Murray went right from the crime scene to the Hospital. Ex 20 p(3). Surely he saw how drunk Harshman was. But he did not mention this in his Police Report. Also, the clinical part of the medical report indicates one blow to the face, not multiple inflicted on Harshman. Ex 21 p(13-15).

In any event, Wade and Murray surely knew that Harshman was too drunk to be a reliable witness that night. That makes Brunson's account the only credible one.

But, according to Brunson, during the first altercation, Harshman threatened to kill him and swung a hammer at his head. Harshman then initiated the second altercation by charging at him on Akin Street. Brunson had every reason to believe that he was in danger. He tried to back away first, while talking to the police on his cell phone and urging them to hurry. But when Harshman overtook him on Akin Street just a bit east of the alley, Brunson had a clear legal justification to hit Harshman in self-defense, and to kick him when he tried to get up and continue the fight.

That should have negated the probable cause to charge Brunson with battery.

But an arrest warrant was in fact issued in this case. That makes the warrant presumptively legal. *Franks v. Delaware,* 438 U.S. 154, 1771-2 (1978); *United States v. Hoffman* 519 F.3d 672, 675 (7th Cir. 2008). As long as the officer obtained the warrant in good faith, "it is the magistrate's error if the arrest is later determined to have been unlawful." *Lawson v. Veruchi,* 2011 U.S. App. Lexis 1783 (7th Cir.) (citing *Olson v. Tyler*, 771 F.2d 277, 281 (7th Cir.1985). Still, an affidavit can be impeached. If it contains statements "[the officer] knew to be false or would have known were false had he not recklessly disregarded the truth," and lacks truthful information "sufficient to constitute probable cause," then the officer's conduct is the active cause of the illegal arrest." *Id*.

The arrest warrant was sworn out for Brunson on August 20, 2010. Ex 22.

Quite obviously, the warrant was typed out by the State's Attorney. The words and description of the incident are from the State's Attorney's office. And Murray said he did not make a recommendation to Wade about probable cause. MD p(50-51).

Murray signed the Warrant, to attest that "the foregoing is true in substance and fact."  Wade signed as well, attesting to the proper application of law (criminal battery) to the facts.  Presumably, her signature also attests that she did not (knowingly) induce the officer to lie or omit material facts.

As a preliminary matter, the warrant states that the battery "was committed at Akin & Main Streets".  This was plainly not true.  The so-called battery occurred near Jack's Barber Shop, which is at the corner of Akin and Judy, a block further east.  Ex 20 p(12). Normally this would be a minor error.  But in this case, the error tends to obscure the glaring contradiction between the witness Seed's testimony and Harshman's dishonest account.

The Warrant goes on to describe the material facts of the incident.  The entire factual description is as follows: "in that he [Brunson] then and there,. . . and while Jody Harshman was on a public way, knowingly caused bodily harm to Jody Harshman, in that he struck Jody Harshman in the head, and kicked Jody Harshman in the face, head, and chest."

That of course would be a *prima facie* battery.  But Defendants omitted everything that matters.  They left out Tena Seed's incontrovertible testimony that Harshman charged at Brunson on Akin Street, not the other way around.  They left out the incontrovertible fact that Harshman was highly intoxicated (263 mg/dl) and therefore not rational.  His account of events could not be considered credible.  They left out the incontrovertible fact that Harshman had just smashed Brunson's windows without any known provocation.  And they also left out evidence (in the form of police pictures of the hammer claw scratches on Brunson's arm) that Harshman did in fact attack Brunson outside his store and swing his hammer at Brunson in the first altercation.

These statements were not "true in substance", and did not allow the Magistrate to give an honest probable cause review.  To be true in substance, the Warrant should have said something like: "in that a highly intoxicated Jody Harshman first smashed the windows of James Brunson's store without provocation, then swung his hammer at Brunson's head and threatened to kill Brunson, before fleeing to Akin street, and in that Brunson then followed at a distance of some 50 feet behind while calling the police for help, and in that Harshman saw Brunson following him and turned

around on Akin street and charged Brunson, wherein Brunson backed away but Harshman overtook him, whereupon Brunson hit Harshman once in the face knocking him down and then kicked him once when he tried to get back up." The difference between these two statements speaks volumes. It appears that Defendants Murray and Wade collaborated to mislead the Judge by omission.

Granted, the possibility exists that only Murray lied, and he deceived Wade. But in the first place, the relevant evidence was contained in the police report (which Wade says she read), and in the Hospital Records (which Wade should have obtained and read). In the second place, Wade confessed to Officer Dooley during the investigative phase of the case, that she knew Mark Schauf was inexplicably present at the scene of the crime. And, she knew Murray was covering this up by refusing to investigate it further or even put it in his police report. Wade told Dooley that she knew she ought to call in the State Police to conduct a proper investigation. But she did not do so.

Wade attempts to claim absolute immunity as a defense. However, prosecutorial immunity is applicable only to prosecutorial functions. *Buckley v. Fitzsimmons*, 509 U.S. 259, 275–76 (1993). Prosecutorial functions are those associated with the judicial phase of the case. Actions taken by a prosecutor during the investigative phase of the case which later cause injury to the complainant due to false arrest (or prosecution) are (at best) subject to qualified immunity. *Fields v. Wharrie*, (7th Cir., Case 13-1195) (decided January 23, 2014) (See esp. pp 9-12).

In a closely related argument, Wade claims that the subsequent probable cause hearing held after the arrest somehow relates back to shield her from the false arrest charges. But *Burns v. Reed* 500 U.S. 478 (1991) teaches that: A prosecutor can be charged with false arrest for giving bad legal advice to the police officers prior to arrest (that it would be okay to use hypnosis to obtain a confession), even though the prosecutor had absolute immunity for omitting the material fact at a subsequent probable cause hearing that the evidence was obtained by hypnosis, and even though probable cause was found based upon the misleading information.

In Brunson's case, the probable cause hearing suffered from the same defects as the original Warrant. Wade presented Murray as a witness. She led him through both Brunson's story and

Harshman's story.  But she did not even mention the independent witness.  Nor did she mention that Harshman was critically intoxicated that night.  The Judge's own concluding words were: "Well obviously there are two versions here.  And the State is accepting one version."  Def. Ex. D, p(23).

The Judge was clearly misled to believe this was a case of two conflicting stories, with Harshman's being at least as credible as Brunson's, so the State could reasonably accept Harshman's story.  The Judge simply had know idea about the indicia of credibility weighing against Harshman.

While Wade has absolute immunity from any cause of action for an injury caused by her misconduct at the probable cause hearing, that does not mean the finding of probable cause was obtained in good faith, so as to negate the false arrest claim.

Before the arrest, Wade's decision not to call in the State Police, when she knew Murray had a conflict of interest preventing him from conducting a proper investigation, was fundamentally an investigative decision, not a prosecutorial one.  It is reasonable to infer that it changed the whole course of the investigation.  The State Police would certainly have presented Wade with a more thorough investigation and a more substantive set of facts, if they had been called in to investigate.

Not only did Wade's decision not to call in the State Police enable Murray to misdirect this case away from the Schaufs, and towards Brunson, but Wade knowingly and/or with reckless indifference collaborated with Murray in omitting key facts on the arrest Warrant and hiding them from the Judge's review.  If the Judge had been presented with facts showing that Harshman's story was not credible, it is unlikely he would have signed Brunson's arrest Warrant.

Wade's last line of defense is qualified immunity.  She argues that Plaintiff cannot cite a case with facts that are substantially similar to this one.  That may be so.  Few communities are run for the Mayor's private gain, the way Bridgeport was, with a quiescent (or complicit) State's Attorney.

But in *Hope v. Pelzer,* 536 U.S. 730, 739-41 (2002) the Supreme Court explained that the issue is fair notice (that her conduct was unlawful) not factual similarity. What was the misconduct? First Wade failed to call the State Police to investigate a possible felony by the Mayor's son, instead leaving it to the Bridgeport Police Chief to (not) investigate his boss' son.  Then, she contrived with

the Police Chief to omit key evidence from the case..

She certainly had fair notice to call the State Police. She knew the factual basis implicating Mark in the attack on Brunson's store. She knew or should have known that the conflict of interest was not just hypothetical – Murray actually withheld evidence. He did not put in the police report that Mark Schauf was present at the scene of the crime. Nor did he report that the police were using cell phones, not police radio. Wade also told Dooley that she knew the proper proceedure was to call the State Police. As already noted, Dooley avers that the State Police should have been called. Wade's excuse – that she could not call in the police because Murray would not put the evidence in the police report amounts to abdicating her authority to Murray. But Wade is the people's representative here. If she does not protect the public from corrupt officials, who will?

Wade's misconduct enabled Murray to present a deeply biased "investigation" that targeted Brunson, and shielded  Mark Schauf, Max Schauf, and (in part) Harshman. She then contrived with Murray to make false statements/omissions on the Warrant request. Either this was intentional, or she showed reckless disregard for the truth. "A warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue." *Knox v. Smith,* 342 F.3d 651, 658 (7th Cir.2003). A material omission of fact is a false statement. *Burns v. Reed (supra)*. Because this law is clearly established, Wade is not entitled to qualified immunity. *Michael C. v. Gresbach*, 526 F.3d 1008, 1013 (7th Cir.2008).

Finally, although Mayor Schauf did not play a direct role in his false arrest. Plaintiff believes that he has presented sufficient circumstantial evidence for this Court to conclude that Schauf was manipulating behind the scenes: (a) to prevent the State Police from coming in to investigate him; (b) to protect his son Mark and friend Harshman; and (c) to have Brunson convicted of felony battery, knowing that a felony conviction would invalidate Brunson's license.

## COUNT III – DUE PROCESS

Count III is directed only to the Bridgeport Defendants, not Wade.

Brunson's liquor license expires each year on April 30th and must be renewed by that date for him to open up on May 1. A renewal is generally *pro forma.* Ex 1 ¶(18-20). Ex 3 ¶(22-4). The application itself is easy to fill out and to review. Ex 1 ¶(18-20). It asks for name, age, and address, and a handful of check the box questions to fill out yes or no (*e.g. "*Have you ever committed a felony?"). If there have been no liquor law violations, and the licensee remains qualified to hold a license (*e.g.* no felonies), the license is renewed. Ex 1 ¶(18-20). Ex 3 ¶(22-8).

Brunson timely filed for his license renewal in early April 2010. Ex 1 ¶(18). He filled it out exactly the same as he had the previous year except he updated his age. Ex 1 ¶(20). At the end of April, Murray came to his store to "inspect". Ex 1 ¶(21). This was not normal procedure. *Id.* Murray told Brunson he found nothing wrong. Ex 1 ¶(22). Brunson asked what this was about. "Is Shauf actually considering not renewing my license?" *Id.* Murray said: "I don't know what he's going to do, but he's going to do something." *Id.* Then he added: "If I were you, I would hire a lawyer." *Id.*

On April 30, Brunson called Schauf and asked if he was going to get his license. Ex 1 ¶(23) Schauf said: No. *Id.* Brunson asked if anything was wrong with his application. *Id.* Schauf said: No. He just wanted to check on some things. *Id.* Brunson then asked when he would get his license. Schauf answered: "I don't know. I'll get back to you." *Id.* But Schauf never did get back to him. *Id.* On May 1, Brunson had to shut down his store because he did not have a license. Ex 1 ¶(29). He remained shut for about four weeks. Ex 1 ¶(40).

State Liquor law authorizes the establishment of local Liquor Commissioners, such as Mr. Schauf, and grants them certain limited executive and judicial powers. 235 ILCS 5/4 But the law gives a (local) Liquor Commissioner only two reasons for shutting down a liquor establishment. He can (1) suspend/revoke the license *for cause* (235 ILCS 5/4-4); 235 ILCS 5/3-12; or (2) deny a license renewal application *for one of the reasons* specified in the statute, addressing either qualifications of the applicant or suitability of the premises. 235 ILCS 5/4-1; 235 ILCS 5/6-1.

Suspension/revocation is a disciplinary action. A (local) Liquor Commissioner is authorized to take such action for cause But he must hold a hearing first to make that determination. *Id.* In

emergency circumstances, he may suspend the license first, and hold a hearing after.  See *Killinger* case below.  But there was no emergency here.  Ex 1 ¶(25-8); Ex 3 ¶(26). And, in any event, Schauf never conducted a hearing at all, either before or after shutting down Brunson's store.  Ex 1 ¶(28, 38, 47-8). Nor did he articulate any reason, not even a mistaken one, for punishing Brunson by "suspending" his license. Ex 1 ¶(25-8). In fact he could not have articulated any reason. Brunson has never been found to violate any state or local liquor laws.  Ex 1 ¶(14); Ex 2 ¶(12).

The renewal of a liquor license is based upon the licensee's continued qualification for the license.  The Illinois legislature did not intend license renewal to be onerous.  It is governed by the same qualifications as the initial license application. "Any licensee may renew his license at the expiration thereof, provided he is then qualified to receive a license." 235 ILCS 5/6-1 .

A Liquor Commissioner has the authority to grant or deny a license renewal.  But this is not a discretionary authority – to reward friends and punish enemies. Ex 3 ¶(22-3, 27-8).  Brunson had the same qualifications he had in 2009, when Schauf approved his renewal.  And he had committed no violations of state or local liquor law since. There was nothing for Schauf to "review."  *Id.*

Of course, the Liquor Commissioner is authorized to ask for documentation, hold a hearing, and/or subpoena records to check an applicants qualifications. 235 ILCS 5/4-5.  But Schauf did none of those things.  He never questioned anything about Brunson's application, not even informally.  Ex 1 ¶(25-8, 38, 47-8).  He never subpoenaed Brunson's records or called a hearing.  *Id.*

Granted, there are other reasons why a license may be rescinded.  235 ILCS 5/4-1  Perhaps a town wants to reduce the number of liquor stores downtown.  But that is a policy decision, to be decided by City Council.  Illinois Liquor Law does not grant the Liquor Commissioner policy-making authority to make those kind of decisions on his own.

To summarize: Schauf's action in shutting down Brunson's store could not have been construed as a suspension, because he did not articulate any cause for the suspension (not even a wrongful one).  Nor could it have been construed as the denial of the license renewal, because Schauf did not identify any prerequisite condition for renewal, which Brunson (arguably) did not

meet.  Thus, Schauf acted entirely outside of his purview or authority as a Liquor Commissioner. This was an act of bullying and harassment intended to put Brunson out of business.

At Deposition, Schauf did not even make the claim that his intention was to suspend Brunson's license or to deny its renewal.  Instead, he stated that he just wanted to review the application.  Ex 1 ¶(23-8); Ex 3 ¶(26-8); SD p(22).  He claimed that the law gave him 15 days for a review.  SD p(22).

Plaintiff has not located any provision authorizing 15 days, or any other time period, to review an application.  But even were that correct, Schauf's explanation is disingenuous.  In the first place, Brunson's license expired on May 1.  He filed for renewal with Schauf approximately three weeks before that date.  Schauf had ample time to review the application *before* Brunson's license expired.  In the second place, Schauf did not issue a license renewal 15 days after May 1 either. There is no evidence he ever reviewed anything, or had any intention of doing so. Ex 1 (38, 47-8).

Furthermore, there were four other liquor establishments in Bridgeport at the time.  Ex 1 ¶(24). Schauf never shut down any these other establishments to "review" their applications for renewal.  Ex 1 ¶(24). Schauf's act of "reviewing" Brunson's application was an arbitrary and raw abuse of power, designed to shut down his store indefinitely or even permanently.

Before closing down a liquor-selling establishment, a Liquor Commissioner must (by law) issue a citation or Order, from which the owner might appeal. 11 IAC 100.350  Schauf did not do that either.  Ex 1 ¶(28).  He left no written record of his actions.  *Id.*

Brunson was forced to hire a lawyer, Eric Bramlet, who filed an appeal with the ILCC.  Ex 1 ¶(31). The ILCC sent an investigator, Randy Mendenhall, to Bridgeport. Ex 1 ¶(32); Ex 3 ¶.  He told Brunson the ILCC could not understand why his license had not been renewed, since there were no allegations of violations at his store.  Ex 1 ¶(33). After talking to each of the principals – Brunson, Murray, and Schauf – Mendenhall determined that Murray's and Schauf's actions had no basis in law, and he so informed them. Ex 3 ¶(26-8).

Mr. Mendenhall prepared a report for the ILCC.  Ex 3 ¶(29). The ILCC then issued an Order

setting a future hearing date.  Ex 1 ¶(38); Ex 3 ¶(30).  In the meantime, the ILCC ordered that Mr. Brunson's license be restored pending appeal.  Ex 3 ¶(31);  Ex 1 ¶(39-40).

But despite the law and the Order from the ILCC, Schauf attempted to stop him from opening.  First he sent Murray to the store to tell him he cannot open because Schauf had not authorized it. Ex 1 ¶(41).  When that did not work, Schauf contacted Scott Gray, Brunson's liquor distributor, and told him to stop delivering to Brunson's store.  Ex 5; Ex 3 ¶(32-7); Ex 1 ¶(43-4).

Also, after I reopened, Schauf began ordering surveillance of my store, presumably to find liquor violations to use at the State hearing.  Ex 1 ¶(45-6); Ex 2 ¶(10-15). No violations were found.

Schauf never bothered to file an answer to Brunson's appeal, presumably because he had no explanation. Ex 1 ¶(47); Ex 3 ¶(38-9).  Shortly before the scheduled hearing, Schauf suddenly and without explanation issued Brunson's license, rendering the hearing moot. Ex 1 ¶(48); Ex 3 ¶(40-1).

But substantial damage was done.  Brunson alleges a denial of due process, which caused his store to close for four weeks, and cast a shadow over his business, creating a false and damaging impression in the community that he had somehow been operating on the shady side of the law.

In addressing Count III, Defendants do not dispute that: (a) a liquor license is a property interest (*Reed v Village of Sherwood* 704 F.2d 943, 949 (7th Cir. 1983)); (b) the failure to renew the license constituted a deprivation (*City of Wyoming v. ILCC,* 48 Ill.App.3d 404, 409 (1977) and *Reed* at 949 (even if license is suspended and not revoked, the loss of business is a deprivation)); or (c) that Brunson was denied due process in that he did not receive notice and/or a hearing.

Defendants' only argument is that Schauf is entitled to absolute/judicial immunity from any cause of action based upon this deprivation.  Defendants rely on *Killinger v Johnson* 389 F.3d 765 (7th Cir 2004), which held that a liquor commissioner's decision to suspend plaintiff's liquor license: (a) before holding a hearing, and (b) without adequate evidence to justify the decision, was not actionable.  In that case, during an outdoor street fair, the police chief informed the Mayor that they had arrested an underage drinker, who allegedly bought his beer from the plaintiff's establishment. The Mayor took immediate action (without a hearing) to suspend plaintiff's license for the duration

of the fair.  The Mayor then held a timely hearing afterward, but found the evidence insufficient.

Plaintiff filed suit alleging violation of due process, for failure to hold a hearing before suspending

his license.

The Seventh Circuit analogized the Mayor's action to a judge's act of issuing a temporary

injunction (without a hearing), and therefore granted the Mayor judicial immunity.

Brunson's case is not analogous.  In *Killinger*, the Mayor acted within his authority as Liquor

Commissioner -- both in making a preliminary determination *ex parte*, however mistaken, that the

plaintiff had sold liquor to a minor, and in taking emergency action before holding a full hearing.

In Brunson's case, as fully discussed above, Schauf acted completely outside of his authority

as Liquor Commissioner.  He did not suspend Brunson's license, not even mistakenly.  He did not

deny his application for renewal, not even mistakenly.  Instead, he took unauthorized action to shut

down his store, on the pretext of doing an indefinite license review. In reality, he tried to create a

kind of pocket veto, wherein a liquor commissioner can take away anyone's liquor license

arbitrarily, without a hearing, and without any lawful cause.  This goes far beyond the discretion the

law grants to a Liquor Commissioner as a quasi-jude of liquor violations.

The Supreme Court has attempted to explain the limits of absolute judicial immunity thusly:

> [I]f a probate judge, with jurisdiction over only wills and estates, should try a
> criminal case, he would be acting in the clear absence of jurisdiction and
> would not be immune from liability for his action; on the other hand, if a judge
> of a criminal court should convict a defendant of a nonexistent crime, he would
> merely be acting in excess of his jurisdiction and would be immune.

*Stump v. Sparkman,* 435 U.S. 349, 357 n.7 (1979)

Plaintiff interprets that to mean that when the Judge acts within his authority as Judge,

however wrongly, his decision is judicial in nature and he is entitled to judicial immunity, but when

he acts plainly outside of his authority as Judge, his decision is not judicial, and he is not so entitled.

Illinois Liquor laws only grant a liquor commissioner limited powers to: (a) suspend or

revoke a liquor license for cause; or (b) to deny a license application because the applicant is not

qualified (in the manner specified by the statute).  When a Commissioner acts outside this narrowly

prescribed authority to suspend or revoke or discontinue a liquor license, he is acting outside his judicial authority and is not entitled to judicial immunity. *Reed v. Village of Shorewood,* 704 F.2d 943, 951 (7th Cir.1983).

In Brunson's case, Schauf did not even pretend to suspend/revoke for cause or to deny a license for lack of qualification. But he forced Brunson to close his store indefinitely.

In so doing, Schauf has attempted to carve out a new power for Liquor Commissioners, which Plaintiff characterizes as a "pocket veto" of a license. Schauf shut down Brunson's business under the guise of "reviewing" his application.  Schauf did not adjudicate anything.  He held no hearing and made no decision that was even arguably *judicial* in nature.  He did not make any determination of fact or law (as the Mayor in *Killinger* did) whether Brunson did or did not commit some violation of State or local liquor laws.  Nor did he make any determination of fact or law whether Brunson qualified for license renewal.

Schauf does not get to claim he was acting as a judge merely because of his *status* as Liquor Commissioner.  "Absolute immunity applies to activities, not offices." *Bryan v. City of Madison, Mississippi*, 213 F.3d 267, 271 (5th Cir. 2000).

If one had to characterize Schauf's actions in this case, he acted (if at all) first in an administrative capacity to review Brunson's paperwork, and second (arguably) as an enforcement officer to shut down Brunson's liquor store while reviewing his paperwork. Even if Schauf took some time to investigate something about Brunson's application (though Schauf never claimed to have done so), that would be the act of an investigative officer as well.

Schauf should not be granted judicial immunity for this conduct.

## II. DENIAL OF EQUAL PROTECTION (CLASS OF ONE)

The Plaintiff intends this Count to apply to Wade, as well as the Bridgeport Defendants, to the extent that Wade is not entitled to immunity for her activities in the investigatory phase of this case, as discussed in Count I. Plaintiff does not allege that Wade interfered with his license renewal.

In *Vill. of Willowbrook v. Olech,* the Supreme Court observed that a "class of one" plaintiff

may obtain remedy under the Fourteenth Amendment by showing: (a) differential treatment from others similarly situated (b) with no rational basis. 528 U.S. 562, 564 (2000).  The Court held that Olech's allegation that her neighbors were only required to grant the village 15-foot easements, whereas she was required to grant the village a 33-foot easement just to have her water hooked up was sufficient grounds to state a conventional class-of-one claim.  *Id* at 565.

In *Esmail v. Macrane*, 53 F.3d 176 (7th Cir.1995), the Seventh Circuit held that the equal protection clause also provides a remedy when "the power of government is brought to bear on a harmless individual merely because a powerful state or local official harbors a malignant animosity toward him." *Id.* At 178. Esmail's case was quite similar to Brunson's. The Mayor revoked Esmail's liquor license allegedly due to personal animus and/or retaliation for an unrelated prior lawsuit. Esmail won on appeal, and then sued the city alleging unequal treatment. *Id.* at 176-8.

The Seventh Circuit noted that this case did not fit the usual mold of selective enforcement cases.  *Id* at 178.  Nevertheless, it held that "action taken by the state, whether in the form of prosecution or otherwise, [in] a spiteful effort to 'get' [the plaintiff] for reasons wholly unrelated to any legitimate state objective" violates the Fourteenth Amendment equal protection clause under a class of one analysis. *Id.* at 180.

The Northern District of Illinois has characterized this principle a bit more broadly as *bad faith*. *Piece Meal Ltd v. Village of Bellwood* 1991 U.S. Dist. LEXIS 14604 (N.D. Ill. 1991). The Court identified the elements of selective enforcement as: (1) differential treatment (2) by a state actor (3) "based on clearly impermissible 'invidious' grounds such as discrimination on the basis of race, religion, the exercise of First Amendment rights or bad faith." *Id.*  An example of bad faith not necessarily based on malice would be if the state actor's motive was to obtain profit for himself.

The holding of *Esmail* was explained and reaffirmed in *Olech v. Village of Willowbrook*, 160 F.3d 386 (7th Cir 1998). The Seventh Circuit explained that selective enforcement applied to Esmail because "the denial of his [license] applications was the result not of prosecutorial discretion honestly (even if ineptly . . ) exercised but of an illegitimate desire to "get" him because of lawful

actions by him that had aroused the mayor's ire". *Id* at 387-8.  The Court described this type of selective enforcement motive variously as "spite", "vindictive action", or "illegitimate animus".  It held that Olech had stated an equal protection claim based on illegitimate animus. *Id* at 388.

On appeal, the Supreme Court upheld the Seventh Circuit on conventional class-of-one grounds (cited above).  It did not reach the Seventh Circuit's *illegitimate animus* rule. Thus, that rule remains the law in this Circuit.  It was applied again in *Geinoski v. City of Chicago* 675 F.3d 473 (7th Cir. 2012), a case addressing selective prosecution by police, which held that if illegitimate animus in the form of official harassment is shown, plaintiff need not identify other citizens not harassed.

On that basis, Brunson claims the Defendants violated his equal protection rights under the Fourteenth Amendment, by acting out of combined motives of greed, spite, and (later) retaliation (in response to his successful appeal of the denial of his liquor license), with the intent to put him out of business.  Specifically, they acted to: (a) shut down his liquor store without cause; (b) withdraw police protection from his store enabling it to be vandalized repeatedly; (c) cover up Harshman's likely involvement in two prior acts of vandalism at Brunson's store; (d) cover up for Mark Schauf's likely involvement as accomplice in the third incident of vandalism; (e) cover up for Harshman's aggravated battery against Brunson; and (f) wrongly convict Brunson of aggravated battery.

Plaintiff incorporates his facts and arguments from Counts I and III, without re-citing them.

Schauf has long had a strong pecuniary interest in the liquor business in and around Bridgeport. (See pp 15-16 of this Brief.). He seemed to have his eye on Brunson's business as well.

Soon after Brunson began operating Bridgeport Package, the Defendants began to harass him and his customers.  Ex 1 ¶(8-17).  The Plaintiff does not claim these incidents to be a denial of equal protection, but they are evidence of Defendants' illegitimate animus towards him.

In one instance, he was told he cannot employ a 20-year-old sales clerk. Ex 1 ¶(13).  There is no such law.  Subsequently Brunson had trouble hiring a replacement sales clerk.  *Id.*  For example, Courtney Padgett worked for him for one day.  *Id*. Then she told him she could not work for him anymore because she was afraid Mayor Schauf would retaliate against her family.  *Id.*

Several customers began telling him that they were being harassed for shopping at his store.

One regular customer Keith Ochs lived in a trailer owned by Mayor Schauf.  Ex 1 ¶(17).  He

told Brunson that Schauf said he would evict him, if he was caught shopping at Brunson's store.  *Id*

He stopped coming to the store.  *Id.*  Another customer, Dustin Wells, told Brunson that Murray

threatened to ticket him for driving his four-wheeler in town, if he shopped at Brunson's store.  *Id.*

Jean Pierson has averred that she was at Blue Star Ambulance to obtain an oxygen tank one

day in summer, 2010, when Murray came in and began talking to the managers of Blue Star without

noticing her.  Ex 6.  He told them it would not look good for their employees to shop at Brunson's

store.  *Id.*  He then told the operators of Blue Star that he wanted Brunson run out of town.  *Id.*

Schauf reported to City Council that there were problems at Brunson's store, when there

were none.  Ex 1 ¶(14-15).  Bridgeport is a small town.  Schauf's dislike for Brunson and his

slanderous statements about me because well-known in the community. Ex 1 ¶(16).  They created

an atmosphere that his store was shady, and he should be made unwelcome in Bridgeport.  Of

course, the real shady character in Bridgeport was Schauf, who is now in jail.

As already noted, Schauf also ordered Dooley to stake out Brunson's store looking for

violations such as selling to underage customers. Two City Council members also staked out

Brunson's store. This surveillance was conspicuous in a small town and bad for business.

By contrast, the police did not bother to provide extra surveillance at Brunson's store to

protect him, even after his store was attacked on two successive weekends.  Ex 2 ¶(26) .

Schauf also maneuvered Council into allowing Sunday liquor sales for "clubs", including his

girlfriend's Veterans Club, but not for package stores (Brunson's being the only one). Ex 1 ¶(13(f).

The Plaintiff argues that this differential treatment became actionable under 42 U.S.C § 1983

as a result of two incidents – (1) Schauf's refusal to renew his liquor license (in May 2010) without

cause; and (2) the attacks on his store on three successive weekends in July and August, 2010.

As already discussed, Schauf arbitrarily and without cause decided to veto Brunson's license

renewal application, by just not acting on it. That forced Brunson to shut down. Presumably, Schauf

intended the shut-down to be permanent.  He never performed a "review" of the application, even belatedly.  By comparison, Schauf never forced any other liquor establishments in Bridgeport to shut down while he "reviewed" their renewal applications. Ex 1¶(24) (compare to other establishments); Ex 3 ¶(22) (There is no distinction between types of licenses for renewal).

The store remained closed until the ILCC intervened, ordering a hearing to be held (by the State) and authorizing Brunson to reopen pending that hearing.  Even so, Murray came to Brunson's store the day he reopened and told him not to do so, because Schauf had not authorized it.  Shortly thereafter, Schauf told Brunson's liquor supplier, Scott Gray, not to sell any more liquor to Brunson.

The Plaintiff contends that this establishes the criteria set forth in *Olech* for selective enforcement.  Not only did Schauf's pocket veto of Brunson's liquor license without cause constitute differential treatment, but the veto was done with an illegitimate desire to "get" Mr. Brunson and drive him out of business, due to a combination of spite and/or greed.

The Bridgeport Defendants contend that Brunson cannot claim to be identical with other liquor establishments because his is the only *package* liquor store in Bridgeport.  But in the first place, Plaintiff does not believe this argument even applies to an *Olech* analysis.  And if it does, it misses the point.  Brunson's store is identical to the other liquor establishments in Bridgeport with respect to the only relevant issue – the process of renewing a license. Ex 3 ¶(22); Ex 1 ¶(24).

Nor can Schauf invoke absolute immunity, for the reasons set forth in Count III.

As for the incident of August 7, 2010, Brunson first compares to Harshman.  Brunson was charged with aggravated battery based solely on Harshman's allegations that he pursued Harshman as he left the store, chased him down from behind, then hit and kicked him. But Harshman was not charged with battery (as alleged by Brunson) for swinging a hammer at his head.

The Defendants' central rationale for charging Brunson is that they had two stories, one by Harshman and one by Brunson; so all other things being equal, the question whether Harshman was telling the truth and Brunson committed battery should be for the jury to decide. That presumes it was equally reasonable to believe Harshman as Brunson.  But, by the exact same logic, it should

have been equally reasonable to believe Brunson as Harshman.  So why did Defendants Murray and Wade not charge Harshman with aggravated battery and let the jury decide that one as well?

Defendants can point to Harshman's injuries being more severe.  Brunson clearly got the better of the fight.  But: "The identity of the winner . . .is not always indicative of who was the aggressor."  *Matthews v. City of St. Louis (*7th Cir 2012) (person with the more severe injuries cannot claim it unreasonable for an officer to find probable cause to charge him with battery, where an independent and credible witness pointed him out as the aggressor).

Besides, Brunson had injuries too.  Granted, they were minor.  But the scratch marks on his arm appear to have been made by the claw of a hammer.  The police took pictures of these scratch marks.  Ex 1 at ^^, PD at ** MD ??.  They indicate that Harshman really did swing a hammer at Mr. Brunson at some point before he threw the hammer away.

Plaintiff alleges, as more fully discussed in Counts I and III, that the reason Harshman was not charged with battery is in substantial part out of malice towards Brunson.  Indeed, Murray expressed his outright malice towards Brunson (Ex 6).  And Schauf demonstated his malice by his many hostile actions, including refusing to renew Brunson's liquor license, pressuring tenants not to buy at his store, ordering Murray to harass Brunson's store with phony regulations, telling Brunson's distributor not to sell liquor to him.

Schauf's hostility culminated in a plot to vandalize Brunson's store, not just once but on three successive weekends.  When Brunson became fed up with the lack of police protection, and acted to protect his own store, he caught Mark Schauf and Jody Harshman as the likely culprits.  The Defendants attempted to turn that on its head by charging Brunson with aggravated battery instead.

Granted Harshman was charged with a felony too, but (a) it was a lesser felony for malicious destruction of property; (b) he was caught red-handed by Brunson; and (c) his police statement amounted to a full confession without mention of any mitigating circumstance.

Harshman also has two prior felonies.  Yet, the prosecutor immediately plea-bargained down to a misdemeanor. Harshman got no jail time and a light sentence.

By contrast, Brunson is still charged with felony battery, three-and-a-half years later.

The Plaintiff also compares to Mark Schauf.  Plaintiff is not an expert on law enforcement, but he believes that the evidence available to Murray and Wade was sufficient to charge Mark Schauf with being an accomplice to Harshman's malicious destruction of property over $300. Nor was this a crime of passion.  Mark's action in this case was premeditated and made with an apparent intent to drive Brunson out of business.

Yet the police did not even mention that Mark was present at the scene of the crime that night.  They did not investigate his involvement.  As a result, they did not charge him with a felony.

Finally, there is evidence to support the conclusion that Mark Schauf and Jody Harshman were acting as proxies for Mayor Schauf, who wanted to intimidate Brunson and drive him out of business.  The police were aware of these allegations, but refused to investigate, and carefully avoided inviting the State Police into town, lest Schauf and his gang be exposed.

Plaintiff believes that there is sufficient evidence for a fact-finder to conclude that he was targeted for persecution by local officials (under the direction of Max Schauf), and he was targeted for criminal prosecution as part of that persecution.

## COUNT IV – TORTIOUS INTERFERENCE WITH BUSINESS

Plaintiff does not allege that Wade has interfered with his business expectations.

Plaintiff incorporates the facts and arguments from Counts I-III without re-citing them.

Plaintiff's complaint is that he runs a retail sales store, and Defendants Murray and Schauf have long used their power as officials of the City of Bridgeport to drive prospective customers from his store.  They have done so out of malice in a concerted attempt to put him out of business.

Plaintiff alleges that: (1) he had a reasonable expectation of doing business with local customers as the only package liquor store in Bridgeport; (2) Defendants knew of this expectancy; (3) Defendant's purposefully interfered by seeking to reduce his customer base, by seeking to intimidate his primary wholesale supplier, by using their authority as Bridgeport officials to shut down his store without cause, and then trying to intimidate him by targeting his store for illegal acts

of vandalism; (4) resulting in loss of business for Brunson.

Brunson suffered damages *per se* when his store was shut down for four weeks due to Schauf's tortious action in refusing to renew his license.  The failure to renew his license was done for no lawful reason, but only with intent on the part of Murray and Schauf to put him out of business.  This constitutes tortious interference with business.  See *Alsherbini v Village of Worth*, 10-6781 (Doc 36) (ND Ill.,3-31-2011) (p. 8) (harassment intended to put a Middle Eastern restaurant out of business is actionable).   Schauf's only defense is his claim that he is entitled to absolute immunity.  But Plaintiff has fully refuted that under Count III.

With respect to the everyday interference with Brunson's business, Defendants argue that Brunson cannot identify any other specific lost business.  But Brunson has identified customers who say Schauf pressured them not to do business with him.  One was threatened with eviction and stopped coming to his store thereafter; another with raising the rent if he shopped at Brunson's store.  Yet another customer was threatened by Murray with a citation (for driving a four-wheeler) if he shopped at the store.  He has also identified a potential employee who was afraid to work for him

Perhaps most significantly, Murray told the managers of Blue Star Ambulance that he did not want their employees shopping at Brunson's store.  He further told them that he wanted Brunson run out of town.  If he told Blue Star, he no doubt told others.  A high level official should not be using his public office to discourage citizens from shopping at a lawful local business.

 Brunson's theory of establishing damages is to show that: (1) Murray and Schauf did pressure and intimidate some customers from shopping at his store; (2) Murray and Schauf intentionally tarnished his reputation in the community; but conversely (3) after Schauf pleaded guilty, Brunson's sales jumped between 15-20%.

Plaintiff has already presented his evidence for points (1) and (2).  In support of this third point, Plaintiff has provided this Court with his sales receipts for a year. Ex 1¶(99-100). The figures show a moderate but significant surge in sales since Schauf pled guilty on May 8.  Brunson believes the 15-20% jump can be attributed to the fact that Schauf is no longer intimidating customers.

## COUNT V - CONSPIRACY

Plaintiff incorporates the facts and arguments from Counts I-IV without re-citing them.

Plaintiff alleges: (1) a conspiracy or combination of (at least) five persons, being Max Schauf, Mark Schauf, Jody Harshman, Scott Murray, and Lisa Wade, (2) for the purpose of accomplishing by concerted action the unlawful acts of repeatedly vandalizing Brunson's store, covering up the involvement of both Mark Schauf and Max Schauf in that vandalism, and falsely accusing Brunson of aggravated battery; (3) which purpose was carried out by the tortious denial of his liquor license by Schauf; and the malicious and unprovoked destruction of Brunson's property and the assault on his person by Harshman in the early morning hours of August 7, 2010.

Plaintiff has presented sufficient evidence in Counts I to IV above that a reasonable juror could infer this to be a conspiracy with the ultimate goal of putting him out of business.

## VI – MONELL CLAIMS AND RESPONDEAT SUPERIEURE

Plaintiff asserts Monell and Respondeat Superieure claims against the City of Bridgeport for Max Schauf's actions in denying Brunson's liquor license.  He clearly was acting as a final decision maker and policy-maker for the City of Bridgeport when he refused to renew Brunson's license.

Plaintiff further asserts Monell and Respondeat Superieure claims against the City of Bridgeport for the repeated actions of harassment against him and his store which culminated in the vandalism of his store on three successive weekends.  This constituted a pattern and practice of behavior targeting Brunson which was cultivated by two of the highest public officials in Bridgeport – Mayor Schauf and Police Chief Murray.

## CONCLUSION

**WHEREFORE**, for all the reasons set forth above, Plaintiffs request that Defendants' respective Motions for Summary Judgment be denied.

Respectfully Submitted
s/Richard Fedder
Attorney for Plaintiff

Richard S. Fedder
ARDC#6272204
921 Cobb Place Manor Dr.
Marietta, Ga. 30066
Telephone: (618) 201-5834
rfddr@yahoo.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2014, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following:

Joseph A. Bleyer
Bleyer and Bleyer
601 West Jackson Street
Post Office Box 487
Marion, IL 62959-0487
(618) 997-1331
(618) 997-6559 (fax)
**jableyer@bleyerlaw.com**


Jennifer M. Lutzke, #6299388
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62706
Phone: (217) 782-9014
Fax: (217) 524-5091
E-Mail: jlutzke@atg.state.il.us


Respectfully submitted,
s/ Richard Fedder