IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JAMES BRUNSON; and )
BRUNSON PACKAGE, INC., )
an Illinois corporation; )
                                  )
     Plaintiffs                     )
                                  )    No. 12-225 GPM/DGW
           v.                            )
                                  )
MAX SCHAUF,    *et. al.*            )
                                  )
     Defendants                )

**AFFIDAVIT OF JAMES BRUNSON**

1. I am a competent adult over the age of 18.

2. During all times relevant to this lawsuit, Defendant Scott Murray was the Bridgeport Police Chief; Defendant Max Schauf was the Mayor of Bridgeport, and Defendant Lisa Wade was the State's Attorney for Lawrence County.

3. Defendant Mark Schauf is the son of Defendant Max Schauf. In the summer of 2010, Mark Schauf was about 18 or 19 years old. He lived in a house on Monroe Street, about five blocks from my store. Defendant Jason Cooper, who was also about 18 or 19 at the time, lived with Mark, as did Defendant Jody Harshman, who was in his 30's at the time.

4. I negotiated to purchase the Red Hill Liquor store from Mr. Henry Kijonka in the summer of 2008. This was a package liquor store located on Judy Avenue, and it was the only package liquor store authorized by the City Council of Bridgeport to hold a liquor license.

5. Mr. Kijonka told me that Max Schauf had also made an offer for the store, through an agent.

6. I purchased the store from Mr. Kijonka. I then applied for and obtained the liquor license that had previously been associated with the Red Hill liquor store. I renamed the store Bridgeport Package Liquor. I was not literally the owner of the store. I formed a corporation to own it. My corporate entity is duly licensed by the State of Illinois as brunson Package Store Inc.

7. Bridgeport Package opened for business under my ownership in November 2008.

8. Within the first few months, at the end of January, Mr Murray began harassing me with a series

of orders to comply with non-existent or phony liquor law rules and regulations. On February 14, I complained to City Council members about an Order I received from Mr. Schauf. On February 18, my tires were slashed.

9. Once I caught on, I started making a point of asking Mr. Murray for a copy of the State Law or Ordinance he was supposed to be enforcing. Mr. Murray could provide no source. On several occasions, he told me that Mayor Schauf had told him to come down and tell me some made up rule I had to comply.

10. When I challenged Mayor Schauf's authority to make up these rules, Mr. Murray said that it does not matter whether there are State laws or City Ordinance. If Mr. Schauf says it is a rule, Mr. Murray said he has to enforce it.

11. On one occasion, Mr. Murray told me that he knew the order he gave me was not supported by the law. But he said he had to enforce the rules as Mayor Schauf told him to because: "You gotta understand I got a family and mouths to feed."

12. On another occasion, after Scott Murray told me I had to be a resident of Bridgeport to own a liquor store, I called Mayor Schauf directly and he told me I have to live in Bridgeport, and he told me he was going to call Randy Mendenhall, an investigator from the State Liquor Commission, and get him to come down to Bridgeport and tell me I cannot own a store in Bridgeport unless I live in Bridgeport. I called the State Liquor Commission and they told me that there was no such rule. My corporation owns the liquor store and does not have to "live" in Bridgeport. I should note that: although this sounds like a general rule Mr. Murray and Mr. Schauf tried to impose on me, it was really targeted only at me, because all of the other bar owners in Bridgeport did live in Bridgeport.

13. Some examples of phony rules or regulations that Mr. Murray and Mr. Shauf enforced or tried to enforce against me are as follows:

    (a) The person I hired to work as a sales clerk at my store was 20-years-old. During the first few months I was operating the store, Mr. Murray came down to the store. He asked me if Max Schauf had been down there to talk to me. I said: "No, what do you mean?" Then he asked my clerk in an accusing fashion how old she was. His voice was sufficiently hostile that my clerk stammered. So I told Mr. Murray she was 20 years old. Murray told her: "You can't work here." Then he told me that she is not even allowed to be inside my store. Afterward, I called the State Liquor Commission and found out there is no such State law. I researched and found no such City Ordinance either.

    (b) In March 2009, Max Schauf told City Council that they were having all kinds of problems at my store and the police had to be called. That was not true. The only reason "police had to be called" to my store was when Mr. Murray came down to enforce this non-existent liquor law. Nevertheless, Mayor Schauf urged City Council at this time to change City Ordinance to make it illegal for a 20-year-old to work as a sales clerk at a

package liquor store. This law did not pass, but it contributed to smearing my reputation.

(c) Subsequently, I had trouble even hiring a sales clerk. For example, I hired Courtney Padgett, and she worked for me for one day. The next day, she came back to the store and said she could not work for me anymore. She said her grandmother did not want her to work for me because Max Schauf might harm their family if she did work for me.

(d) I was told that I cannot operate a liquor store in Bridgeport because I live in the next town over (Lawrenceville) which is three miles from Bridgeport. There was/is no such law or ordinance. I spoke directly to Mr. Schauf about this. He insisted I could not own the business while living out of town. I told him he was wrong. Mr. Schauf then went to City Council and tried to get them to pass a new Ordinance saying that a person who owned a liquor store had to live in town. At the time, the only liquor licensee this law would have impacted was me.

(e) For a long time, I was told I cannot hang signs outside my store advertising the current sale items. I eventually learned there is no such law or ordinance.

(f) I made a presentation to City Council to authorize Sunday liquor sales. Max Schauf opposed it, as was his right. But subsequently, he sought and obtained an ordinance from City Council authorizing clubs, but only clubs, to sell liquor on Sundays. This applied to the Moose Club, and at the time to the Veterans Club. But it left me still closed on Sundays. The Veterans Club was owned by Max's girlfriend, Beverley Preusz, at the time. The State Liquor Commission found soon afterward that the Veterans Club was guilty of "subterfuge ownership", posing as a not-for-profit club, when in fact it was operating as a for-profit bar run by Mayor Schauf and Ms. Preusz. I should add that Jody Harshman was one of the persons listed on the Board of the Veterans Club. The loss of a license left the Veterans Club in limbo. But soon after that, the building burnt down. (See also paragraph 38 below concerning the Veterans Club.)

14. Despite these initial acts of harassment, I was not found to have violated any liquor laws, either State Laws or local Ordinances. This remains true to this day. In more than five years of operations, Bridgeport Package has never had a single violation of State or Local liquor law.

15. Nevertheless, Mayor Schauf told City Council that they were having problems at my store. He deliberately gave my store a bad name in the community, and tried to turn Council Members against me. Still, he never named a single violation of an existing State law or Bridgeport Ordinance that had occurred at my store. These "problems" were all phony, invented by Mayor Schauf himself, and/or Scott Murray.

16. Mayor Schauf's dislike for me and his slanderous statements about me became well known in the community. Many people in the community ssided with Mayor Schauf at that time, and came to believe that there was something shady about my store. This damaged sales.

17. Several customers also told me that Mayor Schauf and/or Chief Murray were pressuring them not to shop at my store or not to work at my store. Some examples:

    (a) Keith Ochs was a regular customer at my store. He said he was a tenant of Max Schauf. He said Mr. Schauf threatened him with eviction if he was caught shopping at my store. After that, he came in very rarely if at all.

    (b) Dustin Wells was a regular customer. He would ride his 4-wheeler up to my store. This was technically illegal to do on the city streets. He came through one day and said he was going mushroom hunting and bought a 6-pack of beer from me. Mr. Murray came by a few moments later looking for Mr. Wells. Later, Mr. Wells told me that Mr. Murray had caught up with him. According to Mr. Wells, Mr. Murray told him (Wells) that it was illegal for him to drive that four-wheeler around town, but it would be okay, so long as he did not shop at my store.

    (c) Jean Pierson told me that she was at Blue Star Ambulance one day obtaining an oxygen tank, when Scott Murray came in and told the managers that I was a [cuss word], and that it would not look good if their employees were seen shopping at my store. She said that Murray said he wanted to drive me out of town.

    (d) As already mentioned, Courtney Padgett signed up to work for me as a sales clerk. She started work, but then a day later, she came in and told me she could not work there anymore. She said her grandmother told her not to work there because Mayor Schauf might do harm to their family if she did. As a result, Ms Padgett quit.

18. My license came up for renewal at the end of April, 2010. This would have been the second time I renewed my license. The City Clerk, Sarah Seacrest, sent me a reminder letter, as was the custom and practice in Bridgeport. Then, I filed a renewal application at Bridgeport City Hall in a timely fashion, about three weeks before my old license was set to expire on April 30.

19. A liquor license renewal is generally *pro forma*. If there have been no liquor law violations at the store, and the license owner remains qualified to hold a license, the license is renewed without question. There is not much to the process. The application itself is easy to fill out and easy to review.

20. My renewal application was essentially identical with my original application in November 2008, and my first renewal in April 2009. The application required me to state I was seeking a license as a package liquor store and that I was acting as a corporation. It asked my name, age, and address. Then it asked three simple check-the-box-yes-or-no questions to show that I am qualified to hold a liquor license. The first question said: Are you of good character and reputation in said city? I answered yes. The second asked: Have you ever been convicted of a felony? I answered: No. The third asked: Have you ever been a keeper of a house of ill-fame? I answered: No. Then I signed a statement saying I would not violate the laws of Bridgeport, the State of Illinois or the United States. That was all there was to the application. It was the

exact same application form in 2008, 2009, and in 2010, and I filled it out in exactly the same way except to change my age. Nothing else had changed in terms of my qualification to hold a license.

21. Police Chief Murray came down to my store one day towards the end of April, 2010, and "inspected" my store. I do not believe that was the usual procedure for renewing a liquor license in Bridgeport. He certainly did not "inspect" my store before issuing a renewal in 2009.

22. Mr. Murray told me he found nothing wrong. I asked him: "What's this all about? Is Shauf actually considering not renewing my license?" He said: "I don't know what he's going to do, but he's going to do something." Then, he said: "If I were you, I would hire a lawyer."

23. On April 30, I called Mayor Schauf and asked him if I was going to get my license. He said: "No, you're not." I asked him if anything was wrong? He said: "No." He said he just wanted to check on some "things." Then I asked him when I would get my license. He answered: "I don't know. I'll get back to you." He never mentioned a so-called 15-day review period, or any other time period in which he would respond to my renewal application. He just said he would get back to me. But he never did.

24. This review period is not a standard procedure in Bridgeport. There were four other liquor establishments in Bridgeport at the time – the Hilltop, JD's, Veterans Club, and Moose Club. In all my time in Bridgeport, none of these other establishments were shut down temporarily to allow Mayor Schauf time to review their renewal applications.

25. Mayor Schauf also did not identify a single concern about my application, or any particular "things" that might have required his further review. I have no idea what those things might have been, and so I had no way to provide him with answers. He also did not ask me for any information with which to clarify any of the "things" which might have been of concern to him.

26. Mayor Schauf also did not allege that I or my store had committed any violations of State law or Bridgeport liquor ordinances, as a reason for delaying the renewal of my license.

27. In short, Mayor Schauf gave me no reason whatsoever for not renewing my license. I do not believe he had a lawful reason. Nor do I believe there were any "things" he wanted to review.

28. Mayor Schauf did not give me a citation, or an Order to shut down, from which I could have had a hearing, and a right to appeal. He just arbitrarily and indefinitely withheld my license. I believe his only purpose was to put me out of business.

29. As a result, I had to shut down my store on May 1, because I no longer had a license, and I knew if I kept the store open, Mayor Schauf would use that as a "violation" to claim I should not be allowed to re-open.

30. Mayor Schauf never did call me to say he had completed his so-called review.

31. I got my license back only after hiring an attorney, Eric Bramlet, and file a written appeal to the

State Liquor Commission.

32. An investigator from the State Liquor Commission, Randy Mendenhall, came down to Bridgeport.

33. Mr. Mendenhall met with me and explained that he had come down to Bridgeport to investigate because the State Liquor Commission did not understand why a liquor license holder who has not had any past record of violations would not be issued a license renewal.

34. At that point, I told Mr. Mendenhall that I thought Mr. Schauf was trying to shut me down for reasons of his own. I discussed a number of the problems that I had had with Mr. Murray and Mr. Schauf at my store. And I told him about Mr. Schauf's interest in the liquor business in and around Bridgeport, including his indirect ownership of the Veterans Club in Bridgeport through his girlfriend, Beverley Preusz. Mr. Mendenhall seemed concerned that if my allegations were true, Mayor Schauf's behavior may have violated the law.

35. To my understanding, Mr. Mendenhall also met with both Mr. Schauf and Mr. Murray.

36. Mr. Mendenhall later told me, and it became public news, that Mr. Schauf was found by the Illinois Liquor Control Commission ("ILCC") to have violated State Liquor laws on at least two issues – (1) subterfuge ownership of the Veterans Club (in particular finding it was not a club at all and did not qualify for a "club" license under Illinois Liquor law); and (2) tax evasion by bringing liquor in from out of state to sell in Illinois without paying Illinois taxes.

37. As for my own case, Mr. Mendenhall made a report to the ILCC.

38. The Liquor Commission then sent an Order setting a hearing date for my case. Since I did not have a hearing with Mr. Schauf, this Order required him to present the reasons for his actions before the ILCC.

39. The Liquor Commission's Order further granted me permission to re-open my store pending this hearing.

40. With that Order in hand, I was able to reopen my store towards the end of May, after I had been shut down for approximately four weeks.

41. The day I re-opened my store Mr. Murray came into my store to challenge me. He said something like: "What makes you think you can reopen your store when we say you can't." I showed him the Order from the ILCC.

42. Mayor Schauf was a party to my appeal. I am sure he received a copy of the State Liquor Commission's Order as well. In addition, the plain language of the Illinois Liquor Laws, which Mr. Schauf is supposed to enforce as a local Liquor Commissioner, state that a liquor store may continue to operate pending an appeal.

43. But that did not stop Mr. Schauf from acting outside the law to try to keep me shut down.

Within just a week or so after I reopened, the City Clerk, Sarah Seacrest, told me that Mayor Schauf had ordered her to call Scott Gray, who owns Gray's Wholesale, and tell him to stop selling liquor to my store. Mr. Gray is the primary supplier of alcohol for my store.

44. Mr. Gray, however, recognized that I had a valid license, and he continued to sell liquor to me.

45. Also, in the next week after I reopened my store, I became aware that my store was being watched by various Bridgeport officials. I observed Bridgeport police officer David Dooley parked just down the street, watching my store for hours, apparently looking for some kind of violation. I further observed a couple of City Council members parked in a car down the street for hours, watching my store.

46. I presume that the purpose of this surveillance was to try to get some ammunition for Mr. Schauf to argue before the State Liquor Commission that my store should be shut down. But whatever they were looking for, they never found any violations.

47. Mr. Schauf never filed an answer to my complaint with the Illinois Liquor Commission. I presume that is because he had no reason or even a plausible excuse for shutting me down.

48. Shortly before the hearing date, Mr. Schauf suddenly re-issued my license, with no explanation for his long delay. He also backdated the license to make it look like he had authorized it back at the end of April.

49. After that, the official harassment let up. Mr. Mendenhall told me he had a talk with Mr. Murray and told him the next time he felt like he had some reason to hassle me at my store, he should check with Mr. Mendenhall first.

50. However, in the summer of 2010, my store became the target of physical attacks and vandalism.

51. The attacks on my store occurred on three successive weekends, starting in July 2010. These attacks each occurred late at night (or early the next morning) when the store was closed.

52. The first incident consisted of a determined attempt to break into my store.

53. My store is not easy to break into. The front windows are sectioned into small window spaces with metal ribbing supporting these windows. A person could smash the windows, but still would not be able to enter the store. The back door, which is in a secluded spot facing back to the alley is a custom made wooden door with an extra layer of OSB sheeting on it.

54. The vandal who came to my store the first weekend clearly tried to break into the store through the back door. He was not intent on merely doing some superficial damage. I believe he intended to destroy the store altogether, either by smashing up the inventory or burning the store down.

55. I do not say this lightly. On successive nights December 27 and December 28, 2009, two small

houses that I owned and rented in Lawrenceville burned down under mysterious circumstances. I would note that I did not have insurance on one and only had very modest insurance on the other. I lost substantial money as a result.

56. There are rumors about Mr. Schauf burning buildings down. I know that several places he owned have burned down, and he presumably collected insurance. One of my customers told me a story about a young man who rented from Mayor Schauf and got behind on his rent after he lost his job. My customer told me that he was personally present in the room with this young man when Mr. Schauf came by and told the young man that if he burned the house down, Mr. Schauf would forgive the rent.

57. As another example, and as discussed in ¶ 38 above, the Veterans Club which was owned by Max Schauf's girlfriend and operated for years under Max Schauf's supervision without a proper license (see Randy Mendenhall's affidavit), was found to be illegal by the ILCC. It obtained a license under the category of being a not-for-profit club, when in fact, it operated as a for-profit bar. To my understanding, problems arose with Mayor Schauf's attempt to convert this to a for-profit bar license. The business was unable to function. Shortly after that, the building in which the Veterans Club was housed (The Legion) burned down.

58. I do not say this because I can prove that anyone intended to burn down my store, but I had serious concerns about it. The acts of "vandalism" caused me great anxiety. I did not consider these acts to be a mere nuisance. That is why I decided to sleep in my store.

59. I called the police the next morning after that first incident, and Mr Murray responded to my complaint. I showed him that the perpetrator(s) took the trim off the door. They appeared to use a hammer and chisel to chip away at the extra layer of wood on the door to try to reveal the dead bolt so they could rip the door out. They also removed the hinge pins in a failed attempt to break in.

60. Murray response was to shrug it off: "Probably just kids." I challenged him that this hardly looked like the work of kids. I have substantial experience doing rehab and remodeling work. Taking out the hinge pins is not easy. Nor is it easy to cut away the door around the deadbolt in order to remove the deadbolt and rip the door out. I would guess these attempts must have taken 20-30 minutes. The perpetrator must have come equipped with tools – hammer, chisel, drill. I also showed Mr. Murray that the perpetrator left behind some equipment as well – a flashlight and safety glasses – which could have been used as evidence. Again, common sense suggests that a teenaged vandal would not bring safety glasses and a flashlight to bust somebody's window or door.

61. I also pointed out to Mr. Murray that the perpetrator was likely somebody who was familiar with the store, and in particular the back door. It appeared he had planned in advance how he was going to break in.

62. Mr. Harshman's uncle, Steve Shoulders, lives next door to the store. In fact, he used to own the

liquor store and operated it for many years. Mr. Harshman was certainly familiar with the store.

63. I told Mr. Murray that I suspected Jody Harshman was the perpetrator.

64. Mr. Murray did not seem at all interested. He did not take my suspicion of Jody Harshman seriously. He did nothing to investigate this incident. He just shrugged it off as a case of teenaged vandals, messing with my store.

65. To my knowledge and belief, Mr. Murray never even bothered to file a police report about this incident. He certainly did not check to see if the perpetrator left fingerprints, as he probably did, on the door and/or on the flashlight and safety glasses left behind. Since Mr. Harshman is an ex-felon, whose fingerprints are probably on record, taking fingerprints might have confirmed or denied whether he was the perpetrator.

66. I believe that Mr. Murray knew as well as I did that Jody Harshman was the likely perpetrator. But he made a conscious decision not to investigate because he did not want to discover that Mr. Harshman was the perpetrator. He knew that Mr. Harshman was being protected by Mr. Schauf.

67. But, even if Mr. Murray honestly believed this was the act of teenagers, it would still have been a criminal act. The fact that teenagers were trying to break into my store suggests, at a minimum, that their purpose was to steal liquor from my store, not merely to do a little superficial damage. Therefore, Mr. Murray should have taken this incident seriously, in any case. But he did not bother to investigate.

68. The second incident occurred the next weekend. This time, the perpetrator seemed to know he could not break into the store. His attack seemed designed to inflict the most possible damage, from the outside of the store. He targeted the most expensive piece of equipment on the outside of my store, being my compressor. He came equipped with a long knife or pick which he jammed down into the compressor causing major damage. I do not think that the attack on my compressor was simply a random act of vandalism.

69. I called the police, and this time, Officer Dooley responded. I told him about the incident from the previous weekend, and I told him that I thought the perpetrator in both instances was Jody Harshman. I further told him that I thought Jody Harshman was acting at the behest of Mr. Schauf.

70. Officer Dooley did file a police report. However, he did not find evidence to identify the perpetrator of this second incident. To my knowledge, he did not try to connect it to the first incident the previous week. Nor did he work with Mr. Murray to investigate both incidents together.

71. The third incident occurred on the very next weekend, on Friday night August 6, or more precisely Saturday morning August 7, 2010.

72. Because I believed the Bridgeport police were not going to do anything to protect me or my store, and because I believed Mr. Murray was already covering up for Mr. Harshman and Mr. Schauf, I decided to stay overnight in my store, armed with a gun to protect it from whomever had been targeting my store for attack.

73. Some time a little after 3:00 A.M. on August 7, 2010, a car drove slowly by the front of my store on Judy Street. Judy Street was otherwise dead at this time, so this car driving by was quite noticeable, and caught my attention.

74. I was sitting on a concrete slab just outside my store in back at the time, trying to stay awake, when that car came by. I heard the car. I saw the headlights. And I got a glimpse of the car at an angle looking out from the back of my store as it went past.

75. A minute later, the same car drove back going the other way going very slowly, and apparently letting someone off.

76. Right after that, I heard the front windows of my store being busted.

77. This all happened quite quickly.

78. The layout of the neighborhood is essential to understanding everything that happened next.

    (a) My store is about the size of a house. It faces front onto Judy Street. There is a parking area in front of my store, which swings around into a driveway on the north side of my store, leading to an alley behind the store. The alley runs north and south, parallel to, but just west of Judy Street. If one heads north through the alley from my store, one passes two houses due north of my store (and just east of the alley) before reaching the next street, which is Akin street. The house immediately next door (to the north) is owned by Jody Harshman's uncle, Steve Shoulders. The driveway separates my store from Jody Harshman's uncle's house. It is literally just four or five steps from Mr. Shoulders' front door to the driveway. The second house to the north actually faces onto Akin street. It is owned by Mr. Harshman's grandmother.

    (b) Jody Harshman's grandmother's house does not run all the way to the corner with Judy Street. To the east of the grandmother's house, at the corner of Akin and Judy street is a small shop, "Jack's Barber shop".

    (c) From my store, if one heads north up the alley, the alley ends at Akin street. One can then either turn left (west) on Akin street towards Main street, or turn right (east) towards Judy Street.

    (d) One substantial issue which distinguishes the account I gave to the police from the account Mr. Harshman gave to police is that Mr. Harshman said he went down the alley and turned east on Akin Street and I chased him down from behind and struck him. That is not true. As I told Mr. Murray in my report, Mr. Harshman first turned west on Akin

Street, then turned around and headed back east to attack me, after he discovered I was following him. I shall explain below why the evidence, including the layout I have just described, corroborates my story and contradicts his.

(e) Mr. Harshman's house on Monroe street was five blocks to the west and north of my store. That was presumably why he turned to the west on Akin Street. He was headed towards home. Also, his roommates, Mark Schauf and Jason Cooper, were waiting in the next block to the west, apparently to pick him up. This appeared to be a rendezvous point.

(f) The reason Mr. Harshman gave (at his deposition) for walking east was because he knew I had a gun, and because I was supposedly shooting at him down the alley. He said he was so frightened that he decided to run to his grandmother's garage (for which he said he had the key) and hide out in there.

(g) However, Mr. Harshman's hammer was found by the police on the lot of the house at the northeast corner of Akin and Main Street. In fact, I pointed the hammer out to the police after having observed Mr. Harshman throw it there, *while* he was walking *west* on Akin Street towards Main Street. The distance from the alley to the spot where the hammer was found by police on the northeast corner of Akin and Main Street is approximately 150 feet. To get the hammer from the alley to the corner of Main and Akin without first walking to the west on Akin street would require a very athletic throw.

(h) Moreover, Tena Seed was a witness that night. I do not know Ms. Seed. To this day, I do not even know what she looks like. And, I had no idea she was a witness when I gave my written account of the event to the police. I described how I was following Mr. Harshman at a distance of about 50 feet going west on Akin Street, while I called 911 to get the police to arrest him. I saw no indication that Mr. Harshman even knew I was following him, until just after he tossed the hammer away. Then, apparently he either heard me talking to Dispatch, or saw me out of the corner of his eye. He suddenly turned around and charged at me, heading back towards the east. I told the police in my account that when he charged at me, I began walking backwards as fast as I could to get away. In the meantime, I was talking to the Dispatcher on my cell phone begging the police to hurry because he was coming at me and gaining on me as I backed away. This fits exactly what Ms. Seed told police. I have seen her signed written report to police. She said she heard a gun shot, and then tried to look out from the south and the west windows of her home and saw nothing. Then she looked out from her north window facing onto Akin Street, and saw two men, one of them on a cell phone walking backwards, the other one coming towards the one who was walking backwards and gaining on him while she watched. Mr. Harshman testified at deposition that he did not even have a cell phone that night. That makes it clear that I was the man with the cell phone backing away. She further stated that both men were heading from west to east, towards Judy Street. That means Mr. Harshman would have had to be to my west,

closer to Main Street than I was. That simply could not have happened if Mr. Harshman was telling the truth that he turned east on Akin Street from the alley, and I chased him down from behind. If that were true, I would have always been to his west.

(i) Furthermore, Ms. Seed's house faces front onto Main Street. It's side points to Akin Street, but the windows on the side are well west of the alley. She herself stated in her narrative, without knowing the significance of it, that she could not see all the way to the alley because there was a tree blocking her view. Therefore, everything she saw was to the west of the alley. That means that Mr. Harshman must have turned west, or she never would have seen either of us at all. This contradicts Mr. Harshman's story in a fundamental way.

(j) As already noted, Mr. Harshman's grandmother's garage is on the section of Akin street east of the alley. It faces out to the north onto Akin Street. It has a garage with a typical garage door (designed for a car to enter) also facing north onto Akin street. It is not likely that this was the door Mr. Harshman intended to enter, or a door for which he had a key. However, on the west side of the garage, almost all the way to the back southwest corner of the garage is an ordinary door for persons to enter or leave. This door faces west towards the alley. It is presumably the door Mr. Harshman intended to use.

(k) Mr. Harshman has testified that he was fleeing down the alley to his grandmother's garage because he had the key to that door and planned to lock himself inside. However, this makes no sense because the direct path to that door would be from the alley, making a bee-line east-northeast. This should have been obvious to any police officer on the scene. It would make no sense to walk all the way north to Akin Street, then head down east to the garage, then head back south alongside the garage to go to the back-side door of the garage.

(l) I have taken a picture from about half-way down the alley and pointing east-northeast, showing the obvious path that Jody would have taken to run to the back door of his grandmother's garage if he were fleeing for his life (as Mr. Harshman said he was doing during deposition). I have also taken another picture straight down the alley from the same spot. Then I have taken a picture from back at my store to the spot where I was standing to take the previous two pictures. That spot is marked in this picture with a trash can. I have also taken a picture pointing from the point about where I was standing in the back of my store when I first accosted Jody Harshman after he smashed my windows. The picture looks directly across to where Jody was when I first accosted him, and it shows that he was only just a few steps from the front door of his Aunt and Uncle's house (where he could have taken shelter) at that time. Finally, I have taken pictures from Akin Street showing the main entrance to Mr. Harshman's grandmother's garage and the back door as it sits on the southwest corner of the garage.

79. The following is my account of the events that took place. My testimony here is consistent with

my written report to the police which I made when the incident happened. It is also consistent with my answers to questions about the incident, posed by Defendants' lawyers at deposition (though they certainly did not give me a chance to tell the whole story):

(a) When I heard the windows smashed, I stepped out from behind the store. At the same time, I saw the perpetrator walking across west on the driveway and heading towards the alley. He was very close to my next-door neighbor's (Jody's Uncle's) house.

(b) I recognized him immediately as Mr. Harshman. And I accosted him, something like: "Jody Harshman, is that you?"

(c) At the moment when I accosted him, Mr. Harshman was literally about five or six steps from his uncle's front door. If he was afraid of me at this time, that would have been the obvious place for him to run to.

(d) But Mr. Harshman did not flee from me. Instead, he turned directly towards me (to the south) and came at me threateningly with his hammer held up in the air.

(e) I backed away, into the backyard of my store. At the same time I took out my gun and pointed it at his feet. I told him to stop.

(f) Then he said something like: "You won't shoot me," and continued coming towards me.

(g) I tried to fire the gun, but the gun jammed, and it audibly misfired. We both heard the click.

(h) Mr. Harshman then said: "Now you're fucking dead", and he cocked his hammer back over his head and took a hard swing at me.

(i) I have substantial training in self-defense. I was able to block his blow. His hammer left scratch marks down my arm, which I showed to the police. The police took pictures of the scratches right there at the scene of the crime, and included them in the police report. I did not realize it at first, but I also had a wound on the back of my head. I did not show this wound to the police at the scene of the crime because I did not yet realize I had it. But I showed it to one of the Dispatchers, Joanne Boren, later that same day. She took pictures of the wound for the record. In any event, I was not seriously injured, but I did have marks from being struck by Mr. Harshman.

(j) The two of us then wrestled for a minute or two. During this action I believe I struck him one solid blow in the face.

(k) My gun went off suddenly (accidentally), as we were wrestling. Nobody was hit. However, this caused us to separate. Mr Harshman tried to let go of me, and in so doing, he fell on his back and then the momentum caused him to hit his head on the ground.

(l) When he hit the ground, I backed away toward Judy street. At first Harshman got up

and started to come at me again. Then he seemed to think better of it and turned back to the alley. However, he said to me: "I'm not done with you yet." And he told me that I'd have to look over my shoulder for the rest of my life.

(m) Mr. Harshman then headed north down the alley. He clearly was fleeing the scene of the crime. But he was not running, just walking kind of quickly. He did not appear frightened, just walking in a matter of fact fashion.

(n) I did not fire the gun again. And in particular, I did not fire at him (as he claimed in his testimony at deposition) while he fled down the alley. In fact, at that point, I thought my gun was still jammed. But of course, I did not discard my gun. I still held onto it.

(o) I should add that Tena Seed said in her witness account to the police that she heard one gun shot (which was undoubtedly the shot when my gun went off while we struggled, which brought her to her window), not multiple gun shots as Mr. Harshman claims.

(p) I was afraid that if I let Mr. Harshman get away, the police would never arrest him. They would say they were not sure I was telling the truth when I said I saw the vandal and it was Mr. Harshman. They might accuse me of making that up because I had already decided that Mr. Harshman was the perpetrator on the previous two weekends. If I had not followed Mr. Harshman, I do not believe Mr. Harshman ever would have been arrested.

(q) So I decided to follow Mr. Harshman at a distance of about 50 feet, while I called the police. That way I would have continuous sight of him until the police came, and there could be no doubt that I had correctly identified the vandal as Mr. Harshman.

(r) I did not intend to be provocative. I did not get close to Mr. Harshman or confront him as he left the scene. In fact, he did not seem to know I was even behind him.

(s) Mr. Harshman walked north down the alley. He then turned west on Akin Street. Even then, he did not yet seem nervous. He was walking at a steady pace, he did not dodge and weave, and he did not seem to know I was following him.

(t) In the meantime, I did call 911 and spoke to a Dispatcher. Our conversation seems to have been a bit garbled. But I explained to the Dispatcher that Jody Harshman had just smashed the windows of my store, then attacked me with a hammer, and I was now following him on Akin Street. I asked them to send police officers to arrest him as quickly as possible.

(u) The Dispatcher did, in fact, send the police. Unfortunately, it was not quickly enough.

(v) I certainly had no intention of provoking a second fight with Mr. Harshman. Why would I have called the police if I intended to take the law into my own hands?

(w) While I was still talking to dispatch, Mr. Harshman stopped and threw his hammer

away, out onto the lot at the northeast corner of Akin and Main Street. I would note that the distance from the corner of the alley and Akin to the point where the police found the hammer on this northeast corner lot of Akin and Main was about 150 feet.

(x) I really have no way of knowing whether he noticed me before or after he threw the hammer. It happened all at about the same time. Perhaps he noticed me out of the corner of his eye when he threw the hammer; perhaps he just heard me talking to Dispatch. Or perhaps there was some other reason. But he suddenly realized I was following behind him, and he turned around to confront me.

(y) Mr. Harshman then charged at me. He was now heading east on Akin Street.

(z) I was still trying to avoid a confrontation. I started backing away as quickly as I could.

(aa) In the meantime, I spoke urgently to Dispatch. I told them something like: "Please hurry. He's coming right at me."

(ab) It was during this time that Ms. Seed must have seen us, with me walking backwards talking on my cell phone, and Mr. Harshman charging at me. (At deposition, Mr. Harshman admitted that he did not even have a cell phone that night. So there is no doubt that Ms. Seed was identifying me as the one who was walking backwards).

(ac) In this manner, with me walking backwards and Mr. Harshman charging at me, we now proceeded back east on Akin street. We went past the alley going east towards Judy Street. This is just as Tena Seed described it. She saw the one man walking backward, the other coming at him, and then they both disappeared out of sight when they went past the alley going east. Tena Seed said she did not see the ensuing fight, because of course that fight took place in front of Mr. Harshman's grandmother's house, which is east of the alley. As already noted, Ms. Seed's view of that section of Akin street east of the alley was obscured by a tree and a 6-foot fence.

(ad) Mr. Harshman continued to come straight at me, finally catching up wth me at the edge of his grandmother's house. He never tried to run towards his grandmother's garage.

(ae) He took a swing at me. I then acted to defend myself. I punched him once in the face. I was still holding the gun and I punched him with my gun hand. The metal from the gun may well have amplified the blow.

(af) In any event, my punch knocked Mr. Harshman to the ground and bloodied him as well.

(ag) But Mr. Harshman did not quit. He scrambled back up on his hands and knees. I saw his head turn to look at me and his muscles tighten (to spring), and I thought he was about to try to tackle me, and continue the fight. I thought I was in immediate danger. So I kicked him once.

(ah) After that, Mr. Harshman appeared to give up. He sat up and smoked a cigarette.

(ai) At this point, I was able to check my gun and fix the jam. I then held Mr. Harshman more or less at gunpoint until the police arrived.

(aj) During this entire altercation, I only punched Mr. Harshman one time, and I only kicked him one time.

80. To my recollection, Officer Jim Lyle, from the Lawrenceville police Department, was the first responder at the scene. He immediately took charge of the investigation.

81. I believe it was Officer Lyle who saw that Mr. Harshman was injured and bleeding, and then called an ambulance to the scene.

82. At about the time that the ambulance arrived, I noticed that the Mayor's son, Mark Schauf, was waiting in his car on Akin Street, just on the other side of Main Street. Jason Cooper was there too. To be precise, I just saw a person in a car at this time. I was still too far away to identify anyone. But when I took the police to the lot on the southwest corner of Main and Akin to show them where Mr. Harshman tossed away the hammer, I could clearly identify Mark Schauf and Jason Cooper waiting on Akin street just west of Main street.

83. In the excitement, I do not know exactly when I first saw them waiting there, or how long they had been waiting. However, I observed them some time shortly before Mr. Murray arrived at the scene.

84. To my recollection, Mr. Murray arrived on the scene shortly after the ambulance arrived. I believe that this was about the same time as Mr. Harshman was placed in the ambulance.

85. I believe I was just taking Officer Lyle to retrieve the hammer and Mr. Murray joined us hammer. It was at that time that I recognized that it was Mark Schauf and Jason Cooper who were watching the scene. I asked Mr. Murray what they were doing there. I could see Mr. Murray's eyes roll back into his head like he was thinking. But he did not answer.

86. At about this time, Mr. Lyle asked Mr. Murray if he wanted to take over the investigation. Mr. Murray said: Yes.

87. This made me concerned, because I did not believe Mr. Murray could do an honest job investigating this incident.

88. So I asked Mr. Murray in front of Mr. Lyle whether it was appropriate for him (Murray) to take charge of this investigation.

89. At the time, Mr. Murray seemed to agree that it would not be appropriate for him to conduct the investigation. He said he would call in the State Police.

90. However, the State Police were never called in to investigate.

91. I told Mr. Murray orally what happened before we left the scene. I filed a written report the

next day. The gist of my description to him is the same as I have just given, though I have provided a bit more detail in this affidavit.

92. I was arrested on Friday August 20. It had been almost two weeks. I assumed they were going to arrest Mr. Harshman any day and I would be vindicated. So I was waiting for that to happen. I saw Scott Murray talking that Friday morning with Mr. Harshman's Aunt next door. I thought maybe that would be about the arrest. So I called Randy Mendenhall and he said: Go look on Judici. I looked on Judici and saw the charges against Harshman. Then I told Randy, and he said: "You didn't happen to look whether there were charges against you?" So I did look, and I saw the charges against me for aggravated battery. I called over to the Police Department and got Dispatcher Donnie Deckard. I said: "What do you know about me being charged with a felony." And he said: "We don't have anything about that here." He suggested I call the Courthouse. I called the Courthouse and they said they didn't know. They said the protocol is that the County Deputy would come and get the warrants to be served and they would take them over to the Sheriff's department and they would be served from there. So then I talked to Randy Mendenhall again and he suggested I call Scott Murray directly, but he did not answer. The rest of the story was told to me by Donnie Deckard who has provided his own affidavit. The upshot of this story is that Murray gave Mr. Harshman a polite opportunity to turn himself in rather than be forcibly arrested. This also tipped him off to come prepared to make bond. But he intended not to give me that same opportunity. Instead he intended to come to my store on Friday afternoon and arrest me and force me to shut down my store at a busy time of day. Quite possibly I would have been stuck in jail all weekend and not been able to make bail until Monday. But fortunately for me, Donnie Deckard would not let Mr. Murray treat me any worse than Mr. Harshman.

93. I was charged with aggravated battery. Mr. Harshman was not charged with battery at all. He was just charged with criminal damage to property for smashing my windows.

94. In his own account of events, Mr. Harshman admitted to Mr. Murray that he smashed my windows. That was never in doubt. He smashed several window panels at my store. I showed these to Mr. Murray. The damage clearly exceeded $300, and no one has ever disputed that.

95. Nevertheless, Mr. Harshman was only required to plead guilty to a misdemeanor for vandalism. He was ordered to pay restitution to me, but he did not serve any jail time.

96. By contrast, I remain charged with a felony. The charge has been hanging over me for three-and-a-half years, damaging my reputation. I have been ready and willing to go to trial. But the prosecution keeps delaying. They have tried to pressure me to plea bargain, but I am not guilty.

97. In summer 2013, I had a discussion with Cody Cessna. He told me that he, Mr. Harshman, and Max Schauf were sitting at Schauf's AES Tools shop one night, talking about vandalizing my store. Cessna said Schauf put a wad of money on the table and offered it to Harshman if he would smash up my store. Cessna said Harshman asked how much, and he (Cessna) offered to count it for him (Harshman). Cessna said that, after that, Harshman took the money.

98. I also believe that several incidents involving the Sheriff's Department and the State's attorney's office also suggested I was being targeted by local authorities.

   (a) My tools were stolen from a property in Lawrence County. This included cutting torches, chains, binders, scrap metal. The burglar also busted my gate so badly I could not fix it. The cutting torches surfaced. Somebody I told about the incident found them at Dewey Eagleson's house. Dewey Eagleson told me he had bought them from Donnie Rudolph. So I contacted Dannie Ash from the Sheriff's Department and told him what had happened and gave him Eagleson's address. Mr. Ash told me he took a statement from Eagleson and sent a report to Lisa Wade. I called Lisa Wade's office several times and left messages for her. She would never answer my calls. Her office kept saying they cannot do anything until they get a full report from police. I spoke to Dannie Ash several times. He would just say he had given Wade the report, and he was waiting. I even told Mr. Ash the license plate number for Mr. Rudolph and where he could be found. But Mr. Ash said he could not do anything until Ms. Wade gave him a warrant. I was left spinning in circles. And nothing was done about my tools. The tools were valued at about $2500. The busted gate was also an expense. This was a typical example of the police and the State's Attorney office intentionally not acting to protect me.

   (b) At my laundromat, someone kicked in the glass door. A surveillance camera gave me a good shot of the man and his vehicle. I reported to police. They said they did not recognize the man. My sister saw the man in the street a couple days later and recognized him and his vehicle. She wrote his license plate number down. I gave the license plate information to Jim Lyle. He said he was going to give it to Ryan Curtis. Then I called another officer who ran the license plate number for me and got his name, Arnold Glosser. I put Arnold Glosser's name in Judici. He had multiple entries. I put his name in Lawrence, Crawford and Wabash counties. Each county had multiple infractions for him. I assumed the police knew who this guy was. After a week or so, I called Ryan Curtis. I said did you run that license information? He said: "Well this guy has multiple addresses. He is basically one of these drifters you can't locate." I asked him if he had any address nearby. He said: No. I later found out Mr. Glosser was living right next door to the Assistant Police Chief in Lawrenceville, Doodle Seitzinger. Nothing was ever done to Arnold Glosser. No charges were ever filed.

   (c) That same Assistant Police Chief, Seitzinger, ran my license plates one time just because my car was parked across from his house in a residential parking place. My car was legally parked, but Mr. Seitzinger had it towed away anyway.

   (d) I noticed that cars were being parked overnight at my laundromat. I suspected they might be related to night-time drug activities. I asked the police to tow them away because they were on my property without my authorization. The police would not do anything.

99. Another important indicator of the impact that Mayor Schauf had on my business is the increase in gross sales after he was put in jail. Granted, Mr. Murray remained the police chief, and that is still a factor. But Mr. Schauf is no longer a strong presence in the community. Mr. Schauf pled guilty on May 8, 2013. He was sentenced to an 18 month jail term on October 18, 2013. My sales receipts during the calendar year 2013 were as follows:

| Month | Amount |
|---|---|
| Sept 2012 – | $26,278 |
| October 2012 – | $22,001 |
| November 2012 – | $24,160 |
| December 2012 – | $24,396 |
| January 2013 – | $23,027 |
| February 2013 – | $24,859 |
| March 2013 – | $25,793 |
| April 2013 – | $28,151 |
| May 2013 – | $32,697 |
| June 2013 – | $28,448 |
| July 2013 – | $27,079 |
| August 2013 – | $29,434 |

100. This data admittedly only covers a very limited time. Mr. Schauf was arrested in February 2013. The sales figures begin to improve in that month. He pled guilty on May 8, 2013. One can see a huge jump in May, which does not last. But the ensuing months are still running a good 15% higher than before. It should also be noted that Mr. Murray was still police chief, and Mr. Schauf was not actually sentenced and put in jail until October.

101. I suffered intense anxiety and emotional distress from the circumstances described above. This emotional distress led to medical problems.

102. I also suffered substantial damage to my reputation. I have always been an upstanding citizen in every sense. Yet many people in town came to think of me as a shady character. I often did not feel welcome to go into public places in my own town.

103. In addition, I had many legal costs. I had to hire a lawyer to fight the loss of my liquor license, another lawyer to contest the criminal charges, and then a lawyer to file this civil claim.

FURTHER AFFIANT SAYETH NOT.

_/s/ James Brunson_
James Brunson

STATE OF Illinois       )
                        ) SS
COUNTY OF Lawrence      )

SUBSCRIBED AND SWORN TO before me this 21st day of February, 2014.

_/s/ Stacy D. Lockhart_
NOTARY PUBLIC

"OFFICIAL SEAL"
STACY D. LOCKHART
Notary Public, State of Illinois
My Commission Expires: 4/4/2015