## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JAMES  BRUNSON; and | ) | |
| BRUNSON PACKAGE, INC., | ) | |
| an Illinois corporation; | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | No. 12-225 MJR/DGW |
| v. | ) | |
| | ) | |
| MAX SCHAUF, individually and in his capacity | ) | |
| as Mayor of Bridgeport, Illinois;  *et. al.* | ) | |
| | ) | |
| Defendants. | ) | |

### THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

### JURISDICTION AND VENUE

This Complaint is brought pursuant to 42 U.S.C. § 1983, amendments four and fourteen to the United States Constitution, and Illinois common law.  Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343(3) and the above statutory and constitutional provisions.  Plaintiffs further invoke supplemental jurisdiction, under 28 U.S.C. § 1367, for this Court to consider claims arising under state law.  Venue exists and is proper pursuant to 28 U.S.C. § 1391 (b) and (c), in that Defendants reside in the Southern District of Illinois, and a substantial part of the events and omissions giving rise to Plaintiff's claim occurred within the Southern District of Illinois.

The Plaintiff requests a jury trial.

### PARTIES

A.   Plaintiff James Brunson is a citizen of the United States.  At all times relevant to the events described herein, Mr. Brunson was a resident of Lawrenceville, Illinois, and the owner of a separately incorporated package Liquor Store in Bridgeport Illinois, incorporated as Brunson's Package, Inc., and known publicly as Bridgeport Package.

B.   Plaintiff Brunson Package, Inc. is a business, incorporated in the State of Illinois.

C.   Defendant Bridgeport is a City in the State of Illinois.

D.   Defendant Max Schauf is a citizen of the United States. At all times relevant to the events described herein, Defendant Schauf was the Mayor of Bridgeport.

E.   Defendant Scott Murray is a citizen of the United States. At all times relevant to the events described herein, Defendant Murray was the Chief of Police of Bridgeport.

F.   Defendant Jody Harshman is a citizen of the United States. At all times relevant to the events described herein, he lived in the City of Bridgeport in Lawrence County, Illinois.

G.   Defendant Mark Schauf is a citizen of the United States.  At all times relevant to the events described herein, he lived in the City of Bridgeport in Lawrence County, Illinois.

## FACTUAL ALLEGATIONS

1.   On or about August 30, 2008, Mr. Brunson bought a package liquor store in Bridgeport, Illinois, formerly known as Red Hill Liquors.  Mr. Brunson incorporated the business as Brunson Package, Inc., and renamed the store: "Bridgeport Package".

2.   At the time, Bridgeport had 4 bars, 1 package store, and 1 private club which sold liquor.

3.   One of these facilities, known as Veterans Club, was purchased and owned by Mayor Schauf, in the name of his girlfriend Beverly Preusz.

4.   In addition, Mayor Schauf was the Liquor Commissioner for the city of Bridgeport.

5.   Upon information and belief, Mayor Schauf had attempted unsuccessfully to purchase Red Hill Liquors shortly before Mr. Brunson bought it.

6.   After Mr. Brunson purchased the store, Mayor Schauf launched a campaign to harass or shake down Mr. Brunson, with the goal of forcing him to sell or abandon the store.

7.   Initially, Mr. Schauf attempted to harass Mr. Brunson by abusing his authority as Liquor Commissioner.  He colluded with his Police Chief, Scott Murray, and other officials from the County Health Department and City Public Works to serve as his enforcement agents.

**8.** On a number of occasions, these agents harassed Mr. Brunson at his store (in front of customers), repeatedly accusing him of various phantom liquor violations.  For example:

a.  Just a few weeks after Mr. Brunson purchased the store, Chief Murray harassed Mr. Brunson's 20 year-old clerk and his only assistant at the store, alleging it was illegal for someone under 21 to sell package liquor.  Mayor Schauf and Chief Murray knew there is no such law.  Nevertheless, both Chief Murray and Mayor Schauf threatened to shut down the store for this "violation".  Not knowing better, Mr. Brunson fired his assistant.

b.  Mr. Brunson then had difficulty finding anyone else to work for him.  At least one prospective employee said she had been warned not to work for him for fear that Mayor Schauf and other city officials would retaliate against her.

c.  Chief Murray and Mayor Schauf next threatened to shut down Mr. Brunson's store due to the "violation" that Mr. Brunson did not reside in Bridgeport.  Again, Chief Murray and Mayor Schauf knew there is no law against out-of-town business ownership. Mayor Schauf and his girlfriend, Beverly Preusz, themselves owned liquor stores in Bridgeport and in Westport, but they were not residents of both towns.

d.  This time, Mr. Brunson contacted the State Liquor Commission, which told him there was no law against out-of-town ownership.  Therefore, he did not comply.

e.  Mr. Brunson sold milk as a convenience to his customers and to draw them into the store.  But the Health Department, also acting on behalf of Mayor Schauf, threatened him with sanctions for selling milk in his store. He was told that he needed a license, and so he was forced to stop selling milk in his store.  No other store in town was required to have a license to sell milk.

f.  Mr. Brunson put a sign up outside his store for the purpose of advertising the products he had on sale. Chief Murray came by and told him to take the sign down, upon orders from the Mayor (acting as Liquor Commissioner).  He told Mr. Brunson that it was illegal to advertise liquor in this way.  Mr. Brunson took down his sign.  But, once again, there is no Illinois Statute or Bridgeport Ordinance barring such signage.  No other stores had to take down their signs.

g.  Mayor Schauf repeatedly informed City Council that the City was having problems with Mr. Brunson's store, leading Council to believe that there were serious violations of law at the store.  This "bad" public reputation hurt his business. But Mr. Brunson was never found guilty of any violations.

h.  Just a few days before the date for the annual renewal of the liquor license, Chief Murray came into the liquor store to inspect it for violations.  When he was done inspecting, he said he could find no violations at the liquor store.

But he threatened or implied that the Mayor would shut the store down anyway.  He warned Mr. Brunson: "If I were you I'd get a lawyer."

i. Even though Chief Murray found no violations during his inspection of the liquor store, Mayor Schauf (acting as Liquor Commissioner) refused to renew Mr. Brunson's license.  Mr. Brunson filed his application for license renewal in a timely fashion, and the law gives the Liquor Commissioner 15 days to renew the license, absent some specific reason for not doing so.  The Mayor cited no violation and gave no legally cognizable reason.   He merely told Mr. Brunson that he (Schauf) was still reviewing the license renewal application.  The annual renewal of a valid liquor license is *pro forma*, absent serious violations at the store or (for example) if the owner committed a felony. The refusal to renew a liquor license without good cause is contrary to law.

j. Even if there were a good cause not to renew Mr. Brunson's liquor license, the Mayor in his role as Liquor Commissioner was required by law to timely inform Mr. Brunson of the alleged cause, and then to form a committee with at least two aldermen and hold a hearing to determine if the license should be renewed.  He did not do so.

k. The Mayor also did not issue any Order denying the license, from which Brunson could appeal.  As a result, Mayor Schauf caused Mr. Brunson's package store to be shut down for approximately a month.  Ultimately, Mr. Brunson hired a lawyer who asked the State Liquor Commission to intervene due to the irregular process.

l. The State Liquor Commission then ordered a hearing before the State Commission, and granted Mr. Brunson permission to reopen his store pending that hearing.  However, the day Mr. Brunson attempted to reopen his store in accord with the State Liquor Commission's Order, Mayor Schauf sent Chief Murray to tell Brunson he could not reopen.  When the State Liquor agent intervened again to assure Brunson and to tell the Mayor that Brunson could reopen his store, Mayor Schauf sought to block Mr. Brunson's store a different way.  He called Mr. Brunson's beer distributor, Scott Gray at Gray Wholesale, and told Mr. Gray that he could not sell product to Mr. Brunson.

9. In every instance, the regulations which Mayor Schauf, his agents, or co-conspirators attempted to impose upon the Plaintiffs, were arbitrary rules made up in order to target Mr. Brunson's store(s) only.  They had no basis in State Statute or in City Ordinance.  The same rules were not applied to other businesses in Bridgeport.

10. Mayor Schauf's duties as City Liquor Commissioner are executive, not legislative.  He has no legal authority to make up laws on his own to regulate liquor sales in Bridgeport.

11. Mr. Brunson complained repeatedly to the State Liquor Commission about the phony regulations being applied to him in Bridgeport.

12. The State Liquor Commission sided with Mr. Brunson each time.  Upon information and belief, Chief Murray was told by an agent of the State Liquor Commission that the next time he thought about hassling Mr. Brunson about any so-called violation, he had better contact the State Liquor Commission first before doing so.

13. As a result, Mayor Schauf's strategy to force Mr. Brunson to sell his store by making *phony* allegations of liquor violations did not work.

14. Mayor Schauf tried alternatively to pressure City Council into passing *genuine* Ordinances targeting Mr. Brunson's store.  For example:

   a. The Mayor persuaded City Council to pass an Ordinance barring minors under the age of 21 from working in a package liquor store.

   b. The Mayor further attempted to pass an Ordinance requiring that one must be a citizen of Bridgeport to obtain a liquor license.  This proposed law failed.

   c. The City Council passed an Ordinance authorizing Sunday liquor sales.  The Mayor was out of town for this vote.  But when he came back, he called a special session of Council to change the Ordinance so that it would allow his girlfriend's establishment to sell liquor on Sundays, but it would not allow Mr. Brunson' package store to sell liquor on Sundays.

15. When they could not put Mr. Brunson out of business by using the law, Mayor Schauf and Chief Murray began resorting to extra-legal forms of harassment by: (a) intimidating persons from working for Mr. Brunson; (b) intimidating persons from shopping at his store; (c) intimidating his wholesale distributors to stop selling him products; (d) using the City's police powers to make false charges against Mr. Brunson personally; (e) committing acts of thuggery against Mr. Brunson and his store; (f) withdrawing police protection for his store; (g) using the local police to cover up for the acts of vandalism; (h) making attacks against Mr. Brunson's person and his other properties; (i) withdrawing

police protection from Mr. Brunson with respect to other properties, and (j) by covering up or failing to investigate other attacks against Mr. Brunson's person and his property.

16. For example, Chief Murray told the owner of a local business that the owner should not permit his employees to purchase from Mr. Brunson's store.  Mayor Schauf, who is also a local landlord, told some of his tenants that if they bought anything from Mr. Brunson's store, he would evict them.  One young woman told Mr. Brunson that she could not work for him, for fear that Mayor Schauf would retaliate against her family.

17. The Mayor and his agents/co-conspirators escalated the illegal attacks on Mr. Brunson by targeting his store for vandalism on three consecutive weekends in July and August 2010.

18. On the first of these weekends, the perpetrator(s) attempted to break into the store but failed.  Mr. Brunson's store is difficult to break into.  The windows have internal bars, which a person cannot climb through.  The perpetrator(s) made a concerted effort to break into the store through the back door.  The back door is a reinforced metal door.  The vandals used a drill to try to drill out and remove the hinges.  They damaged the door, but were unsuccessful at breaking in.

19. On the second weekend, the perpetrator(s) committed acts of vandalism and malicious destruction on the outside of the property, most notably punching holes in the store's compressor, destroying it.

20. Mr. Brunson made criminal complaints to Chief Murray about each of these acts.  Chief Murray refused to investigate, or do anything to protect Mr. Brunson and his store.

21. However, the evidence clearly showed the attacks on his store were more sophisticated than random acts of vandalism.  Mr. Brunson pointed out to Chief Murray that the "vandal" used a drill, and that he had a flashlight and safety glasses (which he left behind).  He further pointed out that when the "vandal" could not break into the store, he destroyed the compressor, the store's most expensive piece of equipment.

22. Mr. Brunson showed Chief Murray the flashlight and safety glasses the intruder left behind.  Yet, Chief Murray refused to investigate.

23. On the third weekend, Mr. Brunson's windows were smashed by a vandal, who then assaulted him with a deadly weapon (being a hammer).  The vandal, the Defendant Jody Harshman, was caught, but not charged with assault or battery.  Nor did Chief Murray investigate, for example, whether Harshman's fingerprints were on the safety glasses or flashlight from the previous weekend.

24. Instead, Mr. Brunson was charged with felony battery for defending himself.

25. The incident occurred some time between 2 A.M. and 3 A.M. on August 7, 2010.  This time, Brunson decided to stay in his store overnight, in order to protect it.

26. The streets were empty, when Mr. Brunson heard a car drive slowly by.  The car turned around and came back.  Then it stopped and let somebody off.

27. Mr. Brunson was in the back of his store.  He heard the windows in the front being smashed.  Then a man came walking swiftly around the back of the house.

28. Mr. Brunson recognized the man as Jody Harshman.

29. Upon information and belief, Mr. Harshman shared an apartment at the time with the Defendant Mark Schauf, the Mayor's son, and the Defendant Jason Cooper.

30. Upon information and belief, Mr. Harshman was also the Mayor's unofficial "enforcer".

31. Mr. Brunson accosted Mr. Harshman, who then turned and advanced upon Mr. Brunson with a hammer in his hand poised to strike.

32. Brunson had a gun.  Pointing it at an angle to the ground, he warned Harshman to stop.

33. Mr. Harshman said something like: "You are not going to shoot", and kept coming. Mr. Brunson then pulled the trigger.  When the gun misfired,  Mr. Harshman said: "Now I'm going to kill you," and swung his hammer.  Mr. Brunson was able to dodge Mr. Harshman's swing.  As the two men struggled, the gun went off without hitting anyone.

**34.** Mr. Harshman then broke free and fled towards the alley behind the store.

**35.** Mr. Brunson followed Mr. Harshman, at a distance of about 50-60 feet.

**36.** Mr. Harshman turned left at the street.  Mr. Brunson continued to follow.

**37.** While following, Mr. Brunson pulled out his cell phone and called 911 for help.

**38.** In the mean time, he saw Mr. Harshman throw his hammer into a neighboring lot.

**39.** After throwing away the hammer, Mr. Harshman appeared to notice for the first time that Brunson was following him.  He turned back and advanced on Mr. Brunson.

**40.**  Mr. Brunson reported to the dispatcher that Mr. Harshman was coming at him, and urged the dispatcher to hurry up and send the police.

**41.** A witness, unknown to Mr. Brunson, told police chief Murray that she looked out her window and saw a man talking on a cell phone and walking backwards, trying to get away from the man who was rapidly approaching him, thus corroborating Brunson's account that he acted in self-defense after Harshman charged him (see below).

**42.** When Mr. Harshman caught Brunson, Harshman again assaulted him.

**43.** In self-defense, Mr. Brunson punched Mr. Harshman and knocked him to the ground.

**44.** Mr. Harshman then tried to get up and lunge at Mr. Brunson.  In response Mr. Brunson kicked Mr. Harshman and told him to stay down.

**45.** At that point, Mr. Harshman appeared to give up the fight.

**46.** Mr. Brunson took the opportunity to fix his gun, and he held Mr. Harshman at gunpoint until the police arrived.

**47.**  Mr. Harshman was taken to the Hospital to treat his injuries.  At the Hospital, his blood alcohol account was found to be dangerously high.

**48.** But even before the police arrived, a civilian vehicle was waiting at the next street corner, in the direction Harshman was walking before he noticed Brunson following him, and turned around to assault Brunson.

49. This vehicle was driven by Mark Schauf, the Mayor's son, with Jason Cooper sitting inside.

50. The first police officers to arrive were Lawrenceville city officer Jim Lyle, and a Lawrence County deputy whose name Mr. Brunson believes was Landers.

51. Chief Murray arrived soon after Lyle and Landers. Brunson explicitly discussed with Murray the fact that the Mayor's son was waiting in a truck at the next street corner.

52. The first thing the officers did, at Mr. Brunson's request, was to go out onto the lot where Mr. Harshman threw the hammer.  They found and retrieved the hammer.

53. Mr. Landers then asked Chief Murray if he wanted to take over the investigation.

54. The fact that the Mayor's son appeared to be involved in this incident put Chief Murray in a compromised position.  It was a clear conflict of interest to have to investigate the son of his boss for being a possible accomplice in a crime.  In addition, Murray had previously been warned by an agent of the State Liquor Commission about making false charges on behalf of Mayor Schauf against Mr. Brunson (for phony liquor violations).

55. In light of this, Brunson questioned whether Murray should conduct the investigation. Murray promised to call in the State police.

56. It is also standard protocol, when a gun is fired during a crime, to call in the State police.

57. In addition, State's attorney Wade announced publicly that she would ask the State police to investigate.

58. However, neither Murray nor Wade called in the State police.  Chief Murray conducted the investigation himself.

59. Chief Murray's acts of investigation consisted of taking statements from witnesses – the parties (Harshman and Brunson), the dispatcher, and a neighbor who (unbeknownst to either party) saw the incident from her window.

60. Murray took Mr. Harshman's statement while he was still at the hospital. Harshman admitted that he vandalized the store. But he told Murray falsely that Brunson then pursued him, chased him down from behind, and beat him up.

61. Mr Brunson, however, reported to Chief Murray that Mr. Harshman had attacked him outside his store, and then in the street Mr. Harshman charged at him again and that he (Brunson) had tried to back away but Harshman overtook him, at which point Brunson threw a single punch, which decked Harshman, and then kicked Harshman when he attempted to lunge at him.

62. The neighbor witness corroborated Brunson, reporting to Murray that she saw a man walking backwards, talking on his cellphone, (being obviously Brunson); and that she saw another man (obviously Harshman) charging at the man on the cellphone, while he retreated.

63. A week or two later, Chief Murray presented his investigative report to Ms. Wade.

64. Chief Murray's final investigative report to Ms. Wade emphasized Mr. Harshman's self-serving and false testimony from the hospital, raised no questions about his credibility, and failed to even mention the unexplained presence of Mark Schauf at 3 AM at the scene of the crime.

65. Some of the evidence readily available to discredit Mr. Harshman included:

    a. Mr. Brunson alleged that Mr. Harshman vandalized his store the previous two weekends. He informed Chief Murray about the attempt to drill out the hinges of his back door two weekends prior, as well as the smashing of his compressor the previous weekend. But Chief Murray refused to investigate or even consider if the crimes were linked.

    b. Mr. Harshman told Chief Murray implausibly that he just woke up from a nap at about 2 AM, and decided to go out and break some windows. Neither Murray nor Wade asked Harshman where he took his nap, or why he targeted Brunson's store.

    c. Alternatively, if the investigators considered that Mr. Harshman might have been dropped off in a car, as Brunson testified, they failed to inquire as to who dropped

him off or why.  Nor did they inquire as to why Mark Shauf was waiting at the next street corner at 3 A.M.

    d.   Mr. Brunson's own statement to the police sharply contradicted Harshman's.  But no attempt was made by Murray to determine who was telling the truth.

    e.   Chief Murray did not consider the testimony of the two independent witnesses:  (a) the Dispatcher from 911 who handled the emergency call from Brunson; or (b) the woman who saw the incident in the street that night. Their testimonies plainly contradicted Mr. Harshman's claim that Mr. Brunson chased him down and attacked him.

    f.   Murray did not consider the evidence that the police found Mr. Harshman lying on the ground at a distance back *towards* Brunson's store, from the lot where the hammer was found.  They did not note that this means Harshman must have turned around, after discarding his hammer, and charged at Brunson.

    g.   Murray did not consider Harshman's record of two prior criminal felonies , or the fact that he was the one who initiated the crime on this particular occasion, when making their determination about whether Harshman was telling the truth.

    h.   Murray did not report that Harshman was so drunk that night, based upon blood alcohol content, that no reasonable police officer would have found his testimony reliable.

**66.** Upon information and belief, Mayor Schauf hired Mr. Harshman to vandalize Brunson's store on each of the three weekends in question.

**67.** One can reasonably infer that Chief Murray's investigation of the three acts of vandalism was intentionally incompetent, a sham investigation designed to cover up the wrongdoing by the Mayor and his son.

**68.** Chief Murray presented his sham investigative report to the State's Attorney for Lawrence County, Ms. Wade.

**69.** Upon Chief Murray's recommendation, and his police report with crucial omissions, Ms. Wade decided to charge Mr. Brunson with a felony battery for hitting and kicking Mr. Harshaman.   She charged Mr. Harshman only with vandalism, not battery.

70. The decision to arrest Mr. Brunson and charge him with criminal battery was not a spur of the moment decision made at the scene of the crime. There was ample time to investigate the incident and collect and review evidence before deciding what charges to make.

71. In light of the available evidence, any reasonable police officer, conducting an unbiased investigation, would have reported to Ms. Wade that Mr. Harshman was the aggressor and Mr. Brunson clearly acted in self-defense. Any reasonable unbiased officer would also have reported and investigated the likelihood that Mark Schauf was an accomplice.

72. Mr. Brunson infers that the criminal charges constituted a further attempt to harass him and put him out of business. In particular, if convicted of a felony, he would lose his liquor license.

73. Mr. Brunson has pleaded innocent to the charges filed against him.

74. But, for a period of more than three years, the charges against Mr. Brunson were left pending, damaging his reputation in the community, and causing him great anxiety over the possible negative outcome of a corrupt government-sponsored prosecution.

75. The prosecution took no action, and kept delaying trial dates to keep the felony charges against Brunson alive in the community. Eventually, the charges were simply dropped.

76. Mr. Brunson has suffered substantial damages including: (a) monetary damage due to loss of business at his store; (b) damage to his physical property; (c) damage to his reputation in the community; (d) substantial legal expenses; and (e) emotional pain and suffering due to the persistent harassment. For as long as he continued to own the store, he lived in fear everyday of another attack on his store. Chief Murray and Mayor Schauf actively discouraged local citizens from working at his store or shopping at his store. As a result, Brunson could not hire or keep assistants. And, the sales in his store were depressed by all the slander and gossip in the community.

77. Because Mr. Brunson could not hire and keep assistants to run the store, he could not attend to other small businesses he had set up in Lawrence County.  This included a laundromat and a couple of rental properties.  These businesses suffered from neglect as a result.

78. Furthermore,  these other properties owned by Brunson were targeted for harassment as a means of trying to drive Mr. Brunson out of town.

79. Most notably, two rental homes owned by Mr. Brunson were burned to the ground on successive evenings – one on December 27, 2009; and one on December 28, 2009.

80. Mr. Brunson lost more than $50,000 from these two fires.  Upon information and belief, at least one of these fires was set by Mr. Harshman at the behest of Mayor Schauf.

81. Mr. Brunson lived in constant fear that they would burn down his liquor store as well.

82. Mr. Brunson attempted to persist for several years, despite the damage to his business and reputation, but eventually he was forced to close his store and sell it for a substantial loss.

### COUNT I – FALSE ARREST
### (DROPPED)

### COUNT II – DENIAL OF EQUAL PROTECTION UNDER THE FOURTEENTH
### AMENDMENT – CLASS OF ONE
### (Against Schauf, Murray, and City of Bridgeport)

83. The Plaintiffs reiterate and incorporate the factual allegations of paragraphs 1-82.

84. The City of Bridgeport, through its agents Mayor Schauf and Chief Murray, targeted Mr. Brunson, his liquor store, and his other small business properties for unequal treatment under the law including that:

   a. Said Defendants attempted to shut down Mr. Brunson's package store because he employed an underage sales clerk, without citing any Illinois Statute or Bridgeport Ordinance which made having an underage sales clerk illegal.  This was a deliberate, arbitrary, capricious, and malicious attempt to shut down Plaintiffs' store under color of State law.  The Defendants did not attempt to shut down other liquor-selling establishments for non-existent violations of law.

b.  Said Defendants attempted to shut down Mr. Brunson's package store because Mr. Brunson was not a resident of Bridgeport, without being able to cite any Illinois Statute or Bridgeport Ordinance which would make this illegal.  This was a deliberate, arbitrary, capricious, and malicious attempt to shut down Plaintiffs' store under color of State law.  The Defendants did not attempt to shut down any other liquor-selling establishment, or any other business in Bridgeport because its owner was not a resident of Bridgeport.

c.  Said Defendants stopped Mr. Brunson from selling milk as a convenience to his customers and a way to increase sales, on the grounds that he did not have a license to sell milk.  Defendants did not cite any Illinois Statute, Bridgeport Ordinance, or Lawrence County Health Department regulation which would make it illegal to sell milk without a milk-selling license.  This was a deliberate, arbitrary, capricious, and malicious attempt to harm Mr. Brunson's business under color of State law.  The Defendants did not require any other business in Bridgeport or in Lawrence County to purchase a license to sell milk.

d.  Mayor Schauf, acting under color of his official position as Liquor Control Commissioner, refused to respond, either to approve or deny, Mr. Brunson's timely application for renewal of his liquor license without offering any legally recognized rationale for denying it. Nor did Mayor Schauf seek further information or request a hearing. Under the law, a Liquor Control Commissioner is required to approve a liquor license renewal application, absent good cause not to renew.  When Mayor Schauf was asked if there was anything wrong with Mr. Brunson's renewal application or any reason why he had not responded to the application in a timely fashion, Mayor Schauf said: No, he was just still "reviewing" it.  Not only was this bogus "review" arbitrary and capricious, it was a deliberate and malicious attempt by Mayor Schauf to stall the process of renewal, thereby forcing Mr. Brunson to close down his store for an extended period of time due to the lack of an updated license.  Mayor Schauf did not undertake lengthy, much less pretextual "reviews"of the license renewal applications from other liquor-selling establishments, thereby forcing them to shut down their businesses for an extended period.

e.  Said Defendants, acting under color of law, intimidated and coerced patrons of Mr. Brunson's store in order to dissuade them from doing business there.  Upon information and belief, Mayor Schauf and Chief Murray also attempted to coerce City employees not to patronize Plaintiffs' store, to coerce other local business owners to pressure their employees not to shop at Brunson's store, to coerce wholesale liquor distributors not to sell to Plaintiffs' store, and to coerce other citizens of Bridgeport not to work for Mr. Brunson.  The Defendants had no rational basis in law for taking these actions against the Plaintiffs.

f.  Mayor Schauf hired Harshman to vandalize Plaintiffs' store on three successive weekends.  From the first week, Chief Murray refused to provide police protection for Plaintiffs' store, and failed to investigate either of the first two acts

of vandalism, thereby aiding and abetting Harshman's further acts of vandalism. When Harshman was caught red-handed the third week, Murray conducted a sham "investigation", which amounted to a cover-up (in degree) of Harshman's felonious criminal acts against Brunson, and a cover-up (in entirety) of Mark Schauf's role as accomplice to the vandalism.

g.   Not only did Chief Murray prepare a misleading police report, he further signed under oath a charging statement against Mr. Brunson which he knew to be false and misleading, because it omitted all of the evidence showing conclusively that Mr. Brunson acted in self-defense.  While Murray's charging statement firmly stated that Mr. Brunson hit and kicked Mr. Harshman, it failed to mention that Harshman had swung a hammer at Brunson's head outside his store just two minutes earlier, and that an independent witness fully corroborated Brunson's claim that, with respect to the second altercation on the street, Harshman charged at Brunson, and Brunson tried (determinedly) to back away (over a distance of a full block) before Harshman caught up with him, and Brunson was forced to strike a blow at Harshman in self-defense.  These are critical material facts which Murray was required by law to state.

h.   By contrast, Murray knew (or at least had probable cause to believe) that Mr. Harshman assaulted Mr. Brunson with a deadly weapon, being a hammer.  He also knew Mr. Harshman confessed to maliciously destroying Mr. Brunson's property in an amount easily exceeding $300.  Yet he did not seek to charge the true assailant, Mr. Harshman with felony battery.  In fact Mr. Harshman was only prosecuted for misdemeanor destruction of less than $300 worth of property.  This unequal treatment of Brunson and Harshman was intentional, designed to protect Harshman (who had two prior felony convictions) and Mark Schauf (who was Harshman's apparent accomplice) while targeting Brunson.

i.   Furthermore, on the night of this incident, Chief Murray promised to invite the State police to investigate, due to his conflict of interest in investigating the Mayor's son.  But he did not do so.  Plaintiff infers that he did not do so because he feared that the State Police might uncover his conspiracy with Mayor Schauf to target Mr. Brunson and put him out of business.

j.   Two rental properties owned by Brunson were burned down on successive nights. City and County officers, who generally cooperate closely, conducted little or no investigation into the perpetrators of these fires.

85.   The actions described in ¶ 84 above collectively show a *pattern* of ongoing harassment of Mr. Brunson by local officials acting under color of law, to target his property for unlawful and criminal acts designed to destroy his businesses.  Chief Murray was overheard saying that he wanted to run Mr. Brunson out of town.

86. Even though Mr. Brunson operated a law-abiding liquor business which never had any legitimate violations, the Defendants concocted phony violations, created special laws targeting only his business, harassed patrons and suppliers, vandalized his store, burned down his rental properties, and then knowingly and wrongfully charged Mr. Brunson himself with a felony.  These tactics were not used against any other law abiding business establishment in Bridgeport.  They were used selectively and with malicious intent to target Mr. Brunson and run him out of town.  The Defendants had no rational basis for treating Plaintiffs' business differently from the other businesses in Bridgeport and Lawrence County.

87. The actions described above were orchestrated intentionally, under color of law,  by two officials with final policy making authority in Bridgeport, being Mayor Schauf and Chief Murray.  This makes the actions into official actions of the City of Bridgeport, and the County of Lawrence, under *Monell*, for which the City and County should be held accountable as well.

WHEREFORE Plaintiffs pray that judgment be entered in his favor and that this Court:

A.  Award compensatory damages from each named Defendant in an amount to be determined at trial for the matters alleged in this Count;

B.  Award punitive damages from each named Defendant to the extent provided for by law, and in an amount to be determined at trial;

C.  Award costs of suit incurred;

D.  Award reasonable attorney's fees; and

E.  Provide such other and further relief as the Court may deem proper.

### COUNT III – DENIAL OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT
### (Against Mayor Schauf and the City of Bridgeport)

88. The Plaintiffs reiterate and incorporate the factual allegations of paragraphs 1-87.

89. At the time of the factual allegations made in this complaint, Mr. Brunson and/or his corporation, Brunson Package, Inc., had property interests in: (a) a liquor license; (b) the physical premises of Bridgeport Package Store; and (c) the business and patronage of Bridgeport Package;

90. The Plaintiffs were deprived, in whole or in part, of their property interests described above, under color of State law, in that: (a) Bridgeport Package lost its liquor license for a substantial period of time, due to Mayor Schauf's failure to renew the license; (b) Bridgeport Package lost a substantial amount of business, due to persistent harassment of the store, its customers, and its employees by Mayor Schauf and Chief Murray; (c) Bridgeport Package suffered substantial damage, due to vandalism by Mr. Harshman, who was acting at the behest of Mayor Schauf and with the protection of Chief Murray (and other local officials) and therefore under cover of law.

91. In addition, the Plaintiffs had a liberty interest in their good reputation in the community.

92. Plaintiffs were deprived of their liberty interests in their good reputation in the community, and Mr. Brunson was deprived of his liberty interest in the safety of his person, in that: (a) Mayor Schauf and Chief Murray repeatedly accused the Plaintiffs of various phony liquor license violations; (b) the storefront for Bridgeport Package was repeatedly vandalized by Mr. Harshman, who was acting at the behest of Mayor Schauf and with the protection of both Mayor Schauf and Chief Murray in their personal capacities and in their official capacities as public officials for the City of Bridgeport; (c) Mr. Brunson was assaulted just outside his store by Mr. Harshman, acting at the behest of Mayor Schauf and with the protection of both Mayor Schauf and Chief Murray (as described in (b) above); and (d) Schauf and Murray publicly blamed Brunson for the altercation, charging him with felony battery and not Harshman.

93. The Defendants Schauf and Bridgeport violated Plaintiffs' procedural due process rights in that they ignored Plaintiffs timely application for annual license renewal, under the pretext of "reviewing" it, thereby forcing Brunson's store to shut down indefinitely, until the State Liquor Commission intervened.  In effect, Defendants used the *pro forma* license renewal process in a manner not authorized by the Illinois Liquor Statute to serve as a form of pocket veto by taking no action whatsoever.  Mayor Schauf did not cite any reason, be it a violation or other issue at the store, for needing extra time to "review" the license renewal application.  He did not issue a written statement, either granting renewal of the liquor license or denying it.  As a result, he gave the Plaintiffs no order to appeal to the State Liquor Commission.

94. Mayor Schauf never articulated any good cause for denying the renewal, as required by statute.  He did not form a committee as required by statute or hold a hearing to determine if there was good cause to deny the renewal.

95. In short, the failure to act on Plaintiffs' license renewal application was a deliberate and malicious attempt by Mayor Schauf to shut down Brunson's business indefinitely, without following any of the procedures laid out in the Liquor Control Act for taking such an aaction.

96. The Defendants Schauf, Murray, and Bridgeport also violated Plaintiffs' substantive due process rights by using executive authority to make rules and regulations by fiat, and without legislative approval, in order to selectively target Brunson's store(s) with charges of wrongdoing.  They used the apparatus of the state to violate his liberty interests by making allegations of wrongdoing against Brunson and his store, which they knew at the time to be false, for the sole purpose of defaming Brunson and making him appear shady in the public eye, thereby driving away business, and ultimately forcing Brunson to close his store.

97.  The Defendants actions did in fact deprive Mr. Brunson of the value of his property and the value of his reputation in the community.

98.  Furthermore, the Defendants acted with malice, in bad faith, and even criminally at times, in order to deprive Mr. Brunson of the property and liberty interests above.

99.  All the actions described were performed intentionally, under color of law.

100.  Several of the actions described in this Count were orchestrated in whole or in part by officials with final policy making authority in Bridgeport (being Mayor Schauf and Chief Murray).  This makes them official actions of Bridgeport, under *Monell*.

WHEREFORE Plaintiff prays that judgment be entered in his favor and that this Court:

A.  Award compensatory damages from each named Defendant in an amount to be determined at trial for the matters alleged in this Count;

B.  Award punitive damages from each named Defendant to the extent provided for by law, and in an amount to be determined at trial;

C.  Award costs of suit incurred;

D.  Award reasonable attorney's fees; and

E.  Provide such other and further relief as the Court may deem proper.

**COUNT IV – TORTIOUS INTERFERENCE WITH BUSINESS EXPECTATION**
**(Against Max Schauf, Mark Schauf, Murray, Bridgeport, and Harshman)**

101.  The Plaintiffs reiterate and incorporate the factual allegations of paragraphs 1-100.

102.  The Defendants purposefully interfered with Plaintiffs' expectation of conducting business with the patrons at Bridgeport Package by: (a) making arbitrary administrative regulations (which Plaintiffs were alleged to have violated); (b) seeking to have Bridgeport pass Ordinances specifically targeting the Plaintiffs for hostile and unequal treatment; (c) unlawfully harassing Plaintiffs' customers, their employees (and prospective employees) and their suppliers; (d) intimidating persons in the community from shopping at Plaintiffs' store; (e) vandalizing Plaintiffs' store; (f) conducting a sham

investigation of the vandalism of Plaintiffs' store; (h) harassing Mr. Brunson through an intentionally false arrest and malicious prosecution; and (i) by using his *pro forma* liquor license renewal as an arbitrary means to force him to shut down his business.

103. The Defendants' actions in interfering with Plaintiffs' expectations of conducting business were undertaken maliciously and without probable cause under Illinois Statutes or Bridgeport Ordinances.

104. The Defendants' actions in interfering with Plaintiffs' expectations of conducting business caused him to lose a substantial amount of business, and ultimately forced him to shut down his business.

105. The Defendants' actions in interfering with Plaintiffs' business expectations were orchestrated intentionally, under color of law, by officials with final policy making authority in Bridgeport (being Mayor Schauf and Chief Murray).  This makes the actions into official actions of the City of Bridgeport under *Monell*.

WHEREFORE Plaintiffs pray that judgment be entered in their favor and that this Court:

A.  Award compensatory damages from each named Defendant in an amount to be determined at trial for the matters alleged in this Count;

B.  Award punitive damages from each named Defendant to the extent provided for by law, and in an amount to be determined at trial;

C.  Award costs of suit incurred;

D.  Award reasonable attorney's fees; and

E.  Provide such other and further relief as the Court may deem proper.

### COUNT V – CONSPIRACY (UNDER ILLINOIS LAW)
### (Against Max Schauf, Murray, Harshman, and Mark Schauf)

106. The Plaintiff reiterates and incorporates the factual allegations of paragraphs 1-105.

107. The named Defendants agreed and conspired to tortiously interfere with the Plaintiffs' business.

WHEREFORE Plaintiffs pray that judgment be entered in their favor and that this Court:

A.   Award compensatory damages from each named Defendant in an amount to be determined at trial for the matters alleged in this Count;

B.   Award punitive damages from each named Defendant to the extent provided for by law, and in an amount to be determined at trial;

C.   Award costs of suit incurred;

D.   Award reasonable attorney's fees; and

E.   Provide such other and further relief as the Court may deem proper.

**COUNT VI – *RESPONDEAT SUPERIEURE* (UNDER ILLINOIS LAW)**
**(Against Bridgeport)**

**108.**   The Plaintiff reiterates and incorporates the factual allegations of paragraphs 1-107.

**109.**   The Defendants Mayor Schauf, using his offices as Mayor and Liquor Control Commissioner for Bridgeport, and Chief Murray, using his office as Police Chief for Bridgeport, committed their tortious acts and omissions under color of law, using their offices as Mayor and Liquor Control Commissioner for Bridgeport, Police Chief for Bridgeport, and state's attorney for Lawerence County.

**110.**   The City of Bridgeport is therefore liable for the tortious actions of its agents, purporting to act under their authority.

WHEREFORE Plaintiffs pray that judgment be entered in their favor and that this Court:

A.   Award compensatory damages from each named Defendant in an amount to be determined at trial for the matters alleged in this Count;

B.   Award punitive damages from each named Defendant to the extent provided for by law, and in an amount to be determined at trial;

C.   Award costs of suit incurred;

D.   Award reasonable attorney's fees; and

E.   Provide such other and further relief as the Court may deem proper.

Respectfully Submitted
s/Richard Fedder
Attorney for Plaintiff

Richard S. Fedder
ARDC#6272204
144 Pineview Road
Carbondale, IL 62901
Telephone: (618) 201-5834
rchfddr@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2017, the foregoing was filed electronically with the

Clerk of Court to be served by operation of the Court's electronic filing system upon the

following:

Joseph A. Bleyer
Bleyer and Bleyer
601 West Jackson Street
Post Office Box 487
Marion, IL 62959-0487
(618) 997-1331
(618) 997-6559 (fax)
**jableyer@bleyerlaw.com**

Jennifer M. Lutzke, #6299388
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62706
Phone: (217) 782-9014
Fax: (217) 524-5091
E-Mail: jlutzke@atg.state.il.us

Respectfully submitted,
s/ Richard Fedder